**Clifton Earl CURTIS, Appellant,**

v.

**The STATE of Texas, State.**

**No. 2–01–076–CR.**

Court of Appeals of Texas,
Fort Worth.

Sept. 26, 2002.

Rehearing Overruled Nov. 21, 2002.

Pete Gilfeather, Fort Worth, for Appellant.

Tim Curry, Criminal District Attorney, Charles M. Mallin, Assistant Criminal District Attorney, Chief of the Appellate Section, Sharon A. Johnson, and Alan Levy and Elizabeth Berry, Assistant District Attorneys, Fort Worth, for Appellee.

PANEL A: DAUPHINOT, GARDNER, and WALKER, JJ.

## OPINION

ANNE GARDNER, Justice.

### INTRODUCTION

Appellant was tried and convicted by a jury of the capital murder of Gloria King, for which he received a mandatory sentence of life imprisonment. In fourteen points, Appellant argues the trial court erred by: (1) overruling his objection to the admission of an extraneous offense from 1983; (2) overruling his objection to medical records that the State introduced without giving proper notice under rule of evidence 902; (3) overruling his objection that the charge did not include the lesser included offenses of murder, sexual assault, or aggravated sexual assault; (4) overruling his request for a charge on the presumption of innocence, his objection to the omission of language in the charge about bias, prejudice, or sympathy entering into the deliberations, and his objection to the omission of language in the charge that the jury should not consider the court's rulings or opinions as evidence; (5) overruling his motion for mistrial based on

the State's remarks in opening argument, and overruling his objections to two incidents where the State argued outside the record; (6) overruling his challenges for cause based on one juror's bias in favor of the State and another juror's inability to set aside her personal experiences; and (7) overruling his objection to expert DNA testimony based on a lack of knowledge of the database. We reverse and remand.

## FACTUAL AND PROCEDURAL HISTORY

On May 7, 1995, officers were dispatched to Gloria King's apartment in response to reports that King had been found dead. Upon their arrival, the officers met with Appellant, who was King's nephew, and his brother-in-law, Lemonia Ball. Ball told the officers that Appellant had come to his house asking Ball to take him to King's apartment. Appellant and Ball explained that when they arrived at King's apartment, they knocked on the door and it came open. They entered and found broken glass, hair curlers, and blood spatters around the living room floor. They discovered King dead in a bedroom. At that time, even after questioning Appellant and investigating the crime, officers were unable to positively connect anyone with King's murder.

In 1997, a detective again questioned Appellant about King's murder and Appellant reiterated the same story that he and Ball had found King dead in her apartment. Officers also retested vaginal and perianal swabs that were taken as part of a sexual assault kit at the time of King's death. Due to advances in the field of DNA evidence, lab technicians were able to positively link male sperm fractions from King's vaginal area to Appellant. Both before and after his arrest, Appellant denied that he had ever had a sexual relationship with King. The indictment charged Appellant with King's capital murder [1] as follows:

Clifton Earl Curtis ... on or about the 7th day of May 1995, did then and there intentionally cause the death of an individual, Gloria King, by strangling the said Gloria King with his hands, and the said defendant was then and there in the course of committing or attempting to commit the offense of aggravated sexual assault [2] of Gloria King.

## Time Line of Events

It is undisputed that King died sometime between 12:00 a.m. and 1:00 p.m. on Sunday, May 7, 1995. On Friday, May 5, a hail storm broke the windows in King's apartment. King's daughter, Catherine Harris, who lived in the apartment with King, took her children and stayed in a motel. Around 10:00 a.m. Saturday, Harris returned to King's apartment. Ladel Bolden and Robert Cooper, two of King's and Harris's friends, were there. Bolden testified that the windows on King's apartment had been boarded up by the time they arrived at the apartment. Bolden also testified that Cooper gave Harris

1. Penal code section 19.03(2) provides that a person is guilty of capital murder if he intentionally commits murder in the course of committing or attempting to commit "kidnapping, burglary, robbery, aggravated sexual assault, arson, or obstruction or retaliation." TEX. PENAL CODE ANN. § 19.03(a)(2) (Vernon 1994).

2. Penal code section 22.021 provides that a person commits aggravated sexual assault if the person intentionally or knowingly "causes the penetration of the anus or female sexual organ of another person by any means, without that person's consent" and if the person "causes serious bodily injury or attempts to cause the death of the victim ... during the course of the same criminal episode." *Id.* § 22.021(a)(1)(A)(i) (Vernon Supp.2002).

about $400 so she could buy a car to drive to Lake Providence, Louisiana.

During the day, before Harris left for Lake Providence, a man named Jimmy Minter came over. When Minter left, Harris told Bolden that Minter had stolen about thirty dollars out of her purse. While Bolden and Cooper were at King's apartment, Harris left to go buy a car to drive to Lake Providence. Later on Saturday evening, after Harris left for Lake Providence, Bolden and Cooper took King to the video store and to pick up something to eat.

Bolden and Cooper drove King back to her apartment, ate, and drank some alcohol with King. At some point that evening, four African–American males that Bolden thought looked between eighteen and twenty-one years old came by King's apartment and stayed for a little while. After those young men left, Bolden and Cooper drove King to the Soft Shoulders nightclub around 11:00 p.m. Bolden and Cooper waited outside for a short time while King went inside the club to see if anyone she knew was there. King came outside with Charles Moody. The two men had seen Moody at King's apartment in the past, so they left the club, and King left with Moody.

Moody acknowledged that he was in the Soft Shoulders nightclub around 10:30 or 10:45 p.m. when he ran into King. King wanted to leave, and Moody agreed to give her a ride home. Moody testified that he went into King's apartment with her, drank a beer, had sex on the couch[3] in the living room with King, and left around 12:00 or 12:15 a.m. Sunday morning. Moody testified that he ejaculated when having sex with King.

Tony West testified that he talked to King before she left the Soft Shoulders nightclub with Moody on Saturday night. West stated that he went to King's apartment at approximately 2:00 a.m. to take her to an after-hours club called Fernandez. West honked his horn a few times, but King did not come out of her apartment, so West got out and went up to the door. According to West, the door to King's apartment was slightly ajar at that time and West could see broken glass on the floor. West testified he called King's name a few times from the door area. When King did not answer, he went to Club Fernandez without her.

Anthony Polk, one of King's previous boyfriends, testified that he talked to King around 7:30 or 7:45 a.m. on Sunday, May 7. Despite the testimony of others that the windows in King's apartment had been boarded up Saturday morning, Polk testified that King asked him to come over and board up her windows on Sunday morning. Polk testified that he went over to King's apartment on Sunday morning between 10:00 and 11:00 a.m., but noticed that the windows had already been boarded up. He knocked on King's door a few times, but did not get an answer, so he left. The record reflects that Appellant and Ball found King's body around 2:00 p.m. on Sunday.

Investigators eliminated Ball, Minter, Moody, and Polk as suspects after comparing their DNA samples to the sample of the semen found on King's body. There was no evidence of Moody's semen in King's vagina, though it was unquestioned that he had sex with King the night of her murder. Out of all the visitors to King's

---

**3.** In his testimony at trial in 2001, Moody testified he and King had sex on her couch in the living room. However, in the written statement that he gave to the police shortly after the murder occurred in 1995, he stated he and King had sex in her bedroom as he sat on the edge of the bed.

home on the Saturday and Sunday before her murder, police could only procure twenty-five fingerprints from the scene. Of those, only four could be identified, and they all belonged to King. Though Harris testified that Appellant, his girlfriend, Joyce, and King were "very close" and were "always together," all of the witnesses testified they were unaware of any sexual relationship between King and Appellant. Appellant has always denied that he engaged in any sort of sexual relationship with King.

### Carolyn Harris

Throughout the trial, the defense attempted to establish that King's daughter, Catherine Harris, who also went by Carolyn, was the real target of the murder because she owed money for a drug debt. The defense presented the testimony of Theressa Jones, a former classmate of Harris's in Lake Providence, and her mother, Letha Ann Jones. Both Theressa and Letha Ann testified that Harris was "real upset," was "crying," and was "real scared" when she arrived at their home in Lake Providence around 12:00 or 1:00 a.m. Sunday morning. According to other witnesses, Harris told them that her mother was dead and that she had stolen a car and fled Fort Worth because people were looking for her and she was afraid they were going to kill her. Both Theressa and Letha Ann testified that Harris was wearing an old nightgown and had arrived on foot.

At trial, Harris vehemently denied that she had been afraid of anyone or had fled Fort Worth because she owed money to anyone. She maintained that she went to Lake Providence, where she used to live, to obtain the records of her children so that she could apply for food stamps in Fort Worth. Harris stated she left for Lake Providence on Saturday and was planning to return on Monday night, be-cause she was scheduled to work on Tuesday. Harris admitted on cross-examination that she never returned to the apartment in Fort Worth where King was killed to collect her or her children's things because she decided to stay in Lake Providence after she learned of King's death.

### THE EXTRANEOUS OFFENSE

Appellant's first and second points relate to the trial court's decision to admit evidence of an extraneous offense. Appellant had been convicted of sexually assaulting an eighty-two-year-old female, B.J., in Louisiana in 1983—eighteen years prior to trial. At trial, Appellant lodged specific and timely objections on the bases of evidence rules 404(b) and 403. Rule of evidence 403 provides in relevant part, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." TEX.R. EVID. 403. Rule of evidence 404(b) provides:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

TEX.R. EVID. 404(b).

Here, the State maintains that the extraneous offense was admitted to show identity, intent, lack of consent to the sexual assault, consciousness of guilt, and to rebut a defensive theory, rather than for an improper purpose, such as character conformity. Despite Appellant's objections, the trial court ruled that the extraneous offense evidence was admissible to show identity and intent, and to show lack of consent by the victim. Because Appel-

lant objected to the extraneous offense about which he now complains on both rule 404(b) and rule 403 grounds, our review of the trial court's decision is two-fold. *Montgomery v. State*, 810 S.W.2d 372, 386 (Tex.Crim.App.1991) (op. on reh'g); *Reyes v. State*, 69 S.W.3d 725, 734 (Tex.App.-Corpus Christi 2002, pet. filed).

## Standard of Review for a Determination under Rule 404(b)

The general rule regarding the admissibility of extraneous offenses is that an accused may not be tried for a collateral crime or for being a criminal generally. *Williams v. State*, 662 S.W.2d 344, 346 (Tex.Crim.App.1983); *Elkins v. State*, 647 S.W.2d 663, 665 (Tex.Crim.App.1983); *Ridgely v. State*, 756 S.W.2d 870, 872 (Tex. App.-Fort Worth 1988, no pet.). However, an extraneous offense may be admissible upon a showing by the prosecution that the extraneous offense is relevant to a material issue in the case. *Williams*, 662 S.W.2d at 346; *Ridgely*, 756 S.W.2d at 872. Appellate courts measure the trial court's rulings concerning the admissibility of evidence of other crimes, wrongs, or acts under rule 404(b) by an abuse of discretion standard. *Montgomery*, 810 S.W.2d at 391. As long as the trial court's ruling is within the zone of reasonable disagreement, the appellate court will not interfere with the ruling. *Id.*

## Standard of Review for a Determination Under Rule 403

In evaluating the trial court's determination under rule 403, a reviewing court is to reverse the trial court's judgment "rarely and only after a clear abuse of discretion." *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim.App.1999); *Montgomery*, 810 S.W.2d at 392. The trial court is in a superior position to evaluate the impact of the evidence. *Montgomery*, 810 S.W.2d at 379. The reviewing court cannot however simply conclude that "the trial judge did in fact conduct the required balancing and did not rule arbitrarily or capriciously." *Mozon*, 991 S.W.2d at 847. "The trial court's ruling must be measured against the relevant criteria by which a Rule 403 decision is made." *Id.* When the relevant criteria are viewed objectively and lead to the conclusion that the danger of unfair prejudice substantially outweighs the probative value of the proffered evidence, the appellate court should declare that the trial court erred in failing to exclude it. *Montgomery*, 810 S.W.2d at 392.

## Application

In *Owens v. State*, the court of criminal appeals reversed the court of appeals' holding that extraneous offense evidence was admissible to rebut the defendant's defensive theory because the defensive theory was not presented to the jury in the trial court's limiting instruction. 827 S.W.2d 911, 917 (Tex.Crim.App.1992). The court stated, "Absent such additional instruction, there is no way for an appellate court to know whether the jury properly applied the evidence of appellant's 'system' to rebut the weight or credibility of appellant's 'frame-up' theory or relied on it for an improper basis such as character conformity." *Id.*

Here, the jury was instructed that it could only consider evidence of the 1983 sexual assault "in determining the issue of consent of the victim in this case and identity and intent of the Defendant, if any, in connection with the offense, if any alleged against him." The jury was not instructed that it could consider the extraneous offense evidence to rebut Appellant's defensive theory or as evidence of his consciousness of guilt. Therefore, it

would be improper under *Owens* for us to assume the jury considered the evidence for either of those purposes. Accordingly, we will only address whether the evidence was properly admitted on at least one of the issues about which the jury was instructed—identity or intent of the perpetrator or lack of consent by the victim.

### *Identity*

█ Identity, that is, whether Appellant was the one who raped and murdered King, was a material and disputed issue at trial. Despite the DNA evidence establishing the presence of Appellant's semen in King's vagina, the State was unable to establish *when* Appellant engaged in sexual intercourse with King, which was essential to convict Appellant of capital murder (which is, as previously noted, murder committed during the course of an aggravated sexual assault). One of the State's expert witnesses, Dr. Marc Andrew Krouse, a forensic pathologist, stated on cross-examination that Appellant's semen could have been in King's vagina anywhere from "just a few hours to several days." On redirect, Krouse confirmed that the semen could be present for up to several days even if the person from which the sample was taken was "alive, in good health, [and] going about their normal activities." There was no direct proof, therefore, that Appellant and King had sexual intercourse the night of her murder, that the sexual intercourse, whenever it took place, was nonconsensual, or that Appellant murdered King. Moreover, other than the DNA evidence, there was no other evidence linking Appellant to the sexual assault or murder of King. Accordingly, because the evidence identifying Appellant as the culprit was contested, the extraneous offense evidence was relevant to the issue of identity.

█ Even if the evidence of an extraneous offense is probative of the identity issue, however, evidence of another crime is admissible to prove identity *only if* there is some distinguishing characteristic common to both the extraneous offense and the offense for which the accused is on trial. *Ford v. State*, 484 S.W.2d 727, 730–31 (Tex.Crim.App.1972). As the *Ford* court stated, "[T]here will always be similarities in the commission of the same type of crime." *Id.; see also Reyes*, 69 S.W.3d at 738.

*Walker v. State* is a good example of an extraneous offense that was held admissible because of its close similarity to the charged offense. 588 S.W.2d 920, 924 (Tex.Crim.App.1979). There, the court of criminal appeals held the crimes were sufficiently similar because both offenses occurred at night, in the same location, and within a month of each other, and in both instances the perpetrator carried a small gun, tied the victims in a similar manner, robbed the victims before raping them, and stole all other change except pennies from the victims. *Id.*

Likewise, in *Clarke v. State*, we held that the extraneous sexual assault offense was sufficiently similar to the charged offense because the victims in each offense were attacked in their homes at night, the perpetrator used duct tape to blindfold both victims and bind their hands and feet, the perpetrator covered his face during both attacks, used a knife in both attacks, asked each victim if she had a gun in the house, forced each victim to have intercourse with him numerous times, and washed one victim's vagina and forced the other victim to wash herself before he left. *Clarke v. State*, 785 S.W.2d 860, 867 (Tex. App.-Fort Worth 1990), *aff'd*, 811 S.W.2d 99 (Tex.Crim.App.1991) cert. denied, 502 U.S. 946, 112 S.Ct. 390, 116 L.Ed.2d 340 (1991).

In contrast, *Ford* is an example of a case in which the crimes were held to be not similar enough to warrant the admission of the extraneous offense on the issue of identity. 484 S.W.2d at 730. There, the court of criminal appeals noted that the similarities were: (1) the perpetrator of each crime was a tall, African–American male; (2) pistols were used and people were injured in both robberies; and (3) the perpetrator of each robbery was described as wearing a purple, silk-type shirt or a purple or lavender knit or sweater-type shirt. *Id.* In holding that the extraneous offense should not have been admitted, the court stated, "What must be shown to make the evidence of [an] extraneous crime admissible is something that *sets it apart from its class or type of crime in general*, and *marks it distinctively in the same manner* as the principal crime." *Id.* (emphasis added).

Similarly, the San Antonio Court of Appeals in *Avila v. State* held that the extraneous offense and the primary offense were not similar enough to warrant admission of the extraneous offense even though both rapes occurred in the dark, at night, and in Crystal City, the perpetrator entered both rooms without the victims' consent, and the perpetrator turned both victims over and had intercourse with the victims in a similar sexual position. 18 S.W.3d 736, 741 (Tex.App.-San Antonio 2000, no pet.). The court of appeals explained: "None of these similarities would mark both offenses as the handiwork of the accused. Instead, the .similarities are more in the nature of the similarities common to the type of crime itself, rather than similarities peculiar to both offenses involved here." *Id.* (internal quotation marks and citations omitted).

Likewise, the Corpus Christi Court of Appeals in *Reyes* held the extraneous offense in that case should not have been admitted because it was not similar enough to the charged offense. 69 S.W.3d at 739–41. The similarities, the court noted, which were that the intruder did not wear glasses, entered both residences in the same vicinity in the early morning hours, fondled the victims while they slept with a child, and fled when they awoke, were "more in the nature of the similarities common to this type of crime itself … rather than similarities peculiar to both offenses." *Id* at 739.

In the present case, the following facts are similar between the instant offense and the extraneous offense: (1) there were no signs of forced entry in either case; (2) Appellant was promised money by both victims and was waiting on them to pay him;[4] (3) in both cases, the women were attacked in the living room and taken into the bedroom where the rapes occurred;[5] and (4) Appellant was acquainted with both victims.

The following facts, however, are different: (1) the B.J. assault occurred in 1983

---

**4.** Ball testified that Appellant told him King had promised to lend him some money, which was why he wanted Ball to take him to King's apartment. According to testimony about the extraneous offense, the victim in that case had agreed to pay Appellant $3.00 to mow her lawn and Appellant was waiting on her to pay him the money when she got her check.

**5.** The State argues one additional similarity between the two offenses is that there was a

quasi-familial relationship between Appellant and both victims and Appellant often spent time at each victim's home prior to the offenses. King was Appellant's aunt by marriage because King's brother was Appellant's step-father. The victim of the extraneous sexual assault, B.J., had been a neighbor of Appellant's and had "treated him just like he was one of her children."

and the King assault and murder in 1995; [6] (2) B.J. was found with no clothes on, but King was found with a nightshirt on, was nude only from the waist down, and had a pillow placed over her genital area; (3) B.J. was eighty-two years old, but King was thirty-nine years old; (4) the area from B.J.'s vagina to her anus was torn so severely that it required stitches, but King suffered no vaginal or anal tearing or trauma; (5) there were obvious signs of a struggle throughout King's apartment, but no such signs in the B.J. case,[7] other than bloody sheets on B.J.'s bed, presumably from vaginal tearing;[8] (6) B.J. was not killed even though she could positively identify Appellant as the one who raped her, but King was killed; (7) the officer who testified at trial regarding the extraneous offense said B.J. told her Appellant "turned her over and started to have sex with her behind," but there is no conclusive evidence in this case that King was anally penetrated (the DNA evidence showed that Appellant's semen was present on the perianal region between King's vagina and her anus and in King's vagina, but not in her anus); and (8) there were no signs or marks of strangulation on B.J.'s neck, but King's neck was severely bruised from strangulation. Although in the B.J. case, the officer testified that B.J. told her that Appellant grabbed her around the neck and forced her from the living room into the bedroom, he did not otherwise choke or strangle her during the attack. The record reflects that, in the instant case, the killer would have had to apply pressure to King's neck for two to five minutes before she would have been deprived of oxygen long enough to die. There is no indication that, other than putting his hands on B.J.'s neck to force her into the bedroom, Appellant applied pressure to B.J.'s neck for an extended length of time or attempted to strangle her.

The court of criminal appeals in *Owens* warned against admitting an extraneous offense on grounds of similarity, when the only real "similarity" between the extraneous offense and the instant one is that they are the same or similar types of offenses. The court noted that admitting an extraneous offense in such a situation merely serves to prove "the very thing that the law on evidence of extraneous offense forbids: proof of the repeated commission of a class of offenses to demonstrate that the defendant is a criminal (or sexual deviant) generally." *Owens*, 827 S.W.2d at 916.

 In addition to specific characteristics, courts take into consideration the time interval between crimes in determining whether to admit an extraneous offense. *Johnson v. State*, 68 S.W.3d 644, 651 (Tex.Crim.App.2002) (holding offenses committed within hours of each other, directed at lone women, and involving victim's red Ford Taurus admissible on issue of identity). Thus, remoteness is another factor to be considered. *Clarke*, 785 S.W.2d at 866; *Reyes*, 69 S.W.3d at 740. In the instant case, the extraneous offense occurred on June 24, 1983, Appellant pled guilty and received a ten-year sentence on December 5, 1983, and the instant offense occurred on May 7, 1995, twelve and one-

---

**6.** Appellant received ten years in prison for the assault on B.J., but the record does not indicate how many of those years he served.

**7.** This could be attributable, however, to the fact that King was much younger and more likely able to struggle with her assailant than B.J.

**8.** Bloody sheets in the instant case were presumably from a cut on King's head caused when the perpetrator hit her with a glass bottle.

half years (or 150 months) after Appellant was convicted of the extraneous offense. As a general rule, the greater the time period between the charged and extraneous offenses, the greater the likelihood of error in admitting the evidence of the extraneous offense. *Reyes,* 69 S.W.3d at 740. The court of criminal appeals has reversed cases where the extraneous offense is too remote in proximity to the instant offense. *See, e.g., Messenger v. State,* 638 S.W.2d 883, 885 (Tex.Crim.App. [Panel Op.] 1982) (reversing conviction where nineteen days elapsed between extraneous and instant offenses), *overruled on other grounds by Almanza v. State,* 686 S.W.2d 157, 157 (Tex.Crim.App.1984); *Bachhofer v. State,* 633 S.W.2d 869, 872 (Tex.Crim.App.1982) (reversing where fifty-two months elapsed between extraneous and instant offenses); *Collazo v. State,* 623 S.W.2d 647, 648 (Tex.Crim.App.1981) (reversing where one year elapsed between extraneous and instant offenses); *James v. State,* 554 S.W.2d 680, 683 (Tex.Crim.App. 1977) (reversing where thirty-three months elapsed between extraneous and instant offenses); *Ford,* 484 S.W.2d at 731 (reversing where two months elapsed between extraneous and instant offenses); *Robledo v. State,* 480 S.W.2d 401, 402 (Tex. Crim.App.1972) (reversing where fifty-one months elapsed between extraneous and instant offenses).

These cases appear to hold similarly because, in addition to time being a significant factor, there was no intervening misconduct by the defendants in each case that might narrow the gap. *See Lang v. State,* 698 S.W.2d 735, 737 (Tex.App.-El Paso 1985, no pet.). In *Lang,* the El Paso Court of Appeals did not reverse the defendant's conviction despite a thirty-nine-month time lapse because his "particular modus operandi was alive and operative through the intervening period," as evidenced by his conduct. *Id.*

The trial court's ruling here falls outside the zone of reasonable disagreement as to whether the offenses were similar enough to warrant admission of the extraneous offense to show identity. To quote *Owens:* "To hold that these two alleged sexual assaults were so nearly identical in method as to constitute a 'system' would run the risk of qualifying almost any two crimes of the same class . . . as a 'system.' " *Owens,* 827 S.W.2d at 915. The State did not show that characteristics of the extraneous offense set it apart from other sexual assault cases, nor is there anything that marks the extraneous offense distinctively in the same manner as the principal crime. *See Ford,* 484 S.W.2d at 730. There are numerous dissimilarities between the extraneous offense and the instant offense, and the similarities are neither unique nor like a "signature" or "earmark" of any particular person. Moreover, the offenses are extremely remote, having occurred over twelve years apart, and the record does not reflect that Appellant engaged in any intervening misconduct that might "narrow the gap" between the two offenses as in *Lang.*

Accordingly, we conclude the trial court abused its discretion in admitting the evidence to prove identity on the basis that the extraneous offense and the instant offense are sufficiently similar. Because evidence of another crime is admissible to prove identity *only if* there is some distinguishing characteristic common to both the extraneous offense and the charged offense, we may conclude the evidence should not have been admitted without considering it in light of the rule 403 criteria, especially given that the crimes occurred so far apart in time. *See id.* at 729.

### *Intent*

Though we have determined that evidence of the extraneous offense was not

admissible on the issue of identity because the crimes were not similar, we must still consider the other factors under which the extraneous offense was admitted. According to the indictment, the State was required to establish that Appellant intentionally or knowingly caused King's death during the course of committing aggravated sexual assault. The elements of aggravated sexual assault, as previously discussed, likewise contain an intentional or knowing requirement. Intent can be inferred from acts, words, and conduct of the accused. *Hernandez v. State*, 819 S.W.2d 806, 810 (Tex.Crim.App.1991) cert. denied, 504 U.S. 974, 112 S.Ct. 2944, 119 L.Ed.2d 568 (1992); *Dues v. State*, 634 S.W.2d 304, 305 (Tex.Crim.App.1982).

 Dr. Krouse testified that the cause of death was manual strangulation and that the perpetrator would need to apply pressure to the larynx or the carotid arteries for at least two to five minutes before the lack of oxygen to the brain would cause the victim to die. With photographs, Krouse explained to the jury how the various abrasions on King's neck demonstrated that the perpetrator's hands were positioned around King's throat. Evidence that the killer had to apply pressure to King's throat for two to five minutes is enough to show death was intentionally or knowingly caused. The DNA evidence of Appellant's sperm in King's vagina showed that he intentionally or knowingly penetrated her female sexual organ. Intent was therefore not a hotly contested issue in the case. Appellant's sole defense was that he was not the murderer. He never contested or attempted to refute evidence showing that King's killer intentionally or knowingly killed or sexually assaulted her. "Where the State's direct evidence ... clearly shows the intent element of the crime and that evidence is uncontradicted by the defendant or not undermined by

cross-examination of the State's witnesses, the offer of other crimes is unjustified due to the lack of relevancy." *Rankin v. State*, 974 S.W.2d 707, 719 (Tex.Crim.App.1996) (op. on reh'g); *DeLeon v. State*, 77 S.W.3d 300, 312 (Tex.App.-Austin 2001, pet. ref'd). The State may not introduce extraneous offenses as circumstantial evidence of an element in its case-in-chief if that element can be readily inferred from other uncontested evidence. *Clark v. State*, 726 S.W.2d 120, 122 (Tex.Crim.App.1986).

Accordingly, we conclude that the trial court abused its discretion in admitting the extraneous offense evidence to show intent. Furthermore, because we hold that the extraneous offense evidence was irrelevant to the issue of intent, we need not address whether its probative value outweighed its prejudicial effect under rule 403.

### *Lack of Consent*

#### i. Rule 404(b) Analysis

 To prove that Appellant was guilty of capital murder, the State had to show that the aggravated sexual assault occurred contemporaneously with the murder. To prove aggravated sexual assault, the State had to prove that King did not consent to sexual intercourse or contact with Appellant. Sexual assault is without consent if the actor compels the other person to submit or participate by the use of physical force or violence. TEX. PENAL CODE ANN. § 22.011(b)(1) (Vernon Supp. 2002); *Barnett v. State*, 820 S.W.2d 240, 241 (Tex.App.-Corpus Christi 1991, pet. ref'd); *Hernandez v. State*, 804 S.W.2d 168, 169 (Tex.App.-Houston [14th Dist.] 1991, pet. ref'd).

There is little doubt that the State needed some evidence to show that King did not consent to sexual intercourse with her attacker. Lack of consent to the sexual assault, as previously discussed, was a ma-

terial and disputed issue at trial because Krouse testified on cross-examination that Appellant's DNA could have been in King's vagina anywhere from a few hours to several days, which leads to the inference that King could have had consensual sexual intercourse with Appellant days before her murder, rather than nonconsensual sexual intercourse contemporaneously with her murder.

That the State needed some evidence to show that the intercourse was not consensual, however, does not mean that *any and all* evidence was admissible to fulfill that purpose. The State argues that the extraneous offense was admissible because "[e]vidence that Appellant had previously choked and violently sexually assaulted B.J., served to assist the jury in determining whether Gloria King . . . had voluntary intercourse with Appellant prior to her death." We fail to understand, and the State does not further explain, how evidence of a sexual assault against B.J. on June 24, 1983, assists the jury in determining that King did not consent to sexual intercourse with Appellant over twelve years later on May 7, 1995. Although it is a reasonable inference that if Appellant is the type of person capable of committing one heinous crime, he is capable of committing another, *this type of inference is precisely what rule 404 is designed to prevent.* If evidence from the B.J. assault does anything, it merely shows character conformity, which is not a proper purpose for admission under rule 404(b).

### ii. Rule 403 Analysis

Even if we agreed that the extraneous offense evidence was probative of the issue of consent, the evidence was highly prejudicial. Evidence of a similar extraneous offense always carries the potential to impress the jury with an accused's character conformity, an impres-

sion the law seeks to avoid. *Lane v. State*, 933 S.W.2d 504, 520 (Tex.Crim.App.1996). The court in *Montgomery* opined that "unfair prejudice" exists when:

a jury would be more likely to draw an impermissible character conformity inference than the permissible inference for which the evidence is relevant, or if [the extraneous offense evidence] otherwise distracts the jury from [the instant offense] and invites them to convict on a moral or emotional basis rather than as a reasoned response to the relevant evidence.

810 S.W.2d at 395.

Here, Officer Lilly Jackson, the officer who arrived on the scene of the B.J. assault, testified that B.J., who was eighty-two years old at the time, was wandering through her house naked and distraught. Officer Jackson stated at least two or three times how old and fragile the victim was. The officer also testified to the extensive vaginal tearing that B.J. suffered, which required her to have numerous stitches. In addition to Officer Jackson's testimony, medical records graphically detailing B.J.'s injuries were admitted, over Appellant's objection, for the jury to peruse.

Based on the record, it appears the extraneous offense evidence was unfairly prejudicial. Not only was the jury more likely to draw an impermissible character conformity inference than a permissible one, but the evidence also invited the jury to convict Appellant on a moral or emotional basis rather than as a reasoned response to the relevant evidence. This is especially true in this case where, even though Appellant objected to the omissions and requested an instruction, the trial court refused to include language in the charge instructing the jury not to let bias, prejudice, or sympathy enter into its deliberations and that it was not to consider the

trial court's rulings or opinions as evidence. Accordingly, because the evidence is not probative of the issue for which it was admitted and is unfairly prejudicial, we conclude that the trial court abused its discretion in admitting the evidence for the purpose of showing King's lack of consent.

### Harm

■ Having found error in the admission of the extraneous offense, we must conduct a harm analysis to determine whether the error calls for reversal of the judgment. Tex.R.App. P. 44.2. If the error is constitutional, we apply rule of appellate procedure 44.2(a) and reverse unless we determine beyond a reasonable doubt that the error did not contribute to appellant's conviction or punishment. Tex. R.App. P. 44.2(a). Otherwise, we apply rule 44.2(b) and disregard the error if it does not affect the appellant's substantial rights. Tex.R.App. P. 44.2(b); *see Mosley v. State*, 983 S.W.2d 249, 259 (Tex.Crim. App.1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070, 119 S.Ct. 1466, 143 L.Ed.2d 550 (1999); *Coggeshall v. State*, 961 S.W.2d 639, 642–43 (Tex.App.-Fort Worth 1998, pet. ref'd) (en banc).

■ Because the issue here involves the erroneous admission of evidence, the error is not constitutional; therefore we are to disregard the error unless it affected Appellant's substantial rights. Tex. R.App. P. 44.2(b); *DeLeon*, 77 S.W.3d at 316. A substantial right is affected when the error had a substantial and injurious effect or influence on the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim.App.1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)); *Coggeshall*, 961 S.W.2d at 643. In making this determination, we review the record as a whole. *Kotteakos*, 328 U.S. at 764–65, 66 S.Ct. at 1248.

Having carefully reviewed and discussed above the contents of the record, we conclude that, in the context of the entire case against Appellant, the trial court's error in admitting the extraneous offense evidence had a significant or injurious effect on the jury's verdict such that Appellant's substantial rights were affected. *See Coggeshall*, 961 S.W.2d at 643. Other than the DNA evidence of Appellant's semen in King's vagina, which could have been there for days before the murder, there is no evidence to link Appellant to the aggravated sexual assault or the murder. Because the evidence that Appellant committed the murder was speculative at best, the admission of the extraneous sexual assault was imperative to the State's case and had a significant or injurious effect on the jury's verdict. Accordingly, we sustain Appellant's first point. Because we sustain Appellant's first point, resulting in a remand for a new trial, we need not address Appellant's second, sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, and fourteenth points.

### Jury Charge Error

### Lesser Included Offenses

In points three, four, and five, Appellant argues that the trial court erred by overruling his objection to the omission of the lesser included offenses of sexual assault, aggravated sexual assault, and murder in the jury charge. Because we are reversing and remanding this case for a new trial based on the erroneous admission of extraneous offense evidence, we will consider whether Appellant is entitled to an instruction on a lesser included offense.

■ To determine whether a jury must be charged on a lesser included offense, we apply a two-step analysis. *Moore v. State*, 969 S.W.2d 4, 8 (Tex.Crim.App.1998). The first step is to decide whether the offense

is a "lesser included offense" as defined in article 37.09 of the code of criminal procedure. TEX.CODE CRIM. PROC. ANN. art. 37.09 (Vernon 1981); *Moore*, 969 S.W.2d at 8. The second step requires an evaluation of the evidence to determine whether there is some evidence that would permit a rational jury to find that the defendant is guilty only of the lesser offense, and not of the greater. *Lofton v. State*, 45 S.W.3d 649, 652 (Tex.Crim.App.2001); *Moore*, 969 S.W.2d at 8.

### First Step

▇▇▇▇▇ A lesser included offense is defined both in terms of the offense charged and the facts of the case: "An offense is a lesser included offense if ... it is established by proof of the same or less than all the facts required to establish the commission of the offense charged." TEX.CODE CRIM. PROC. ANN. art. 37.09(1) (Vernon 1981). Sexual assault is a lesser included offense of aggravated sexual assault, which is a lesser included offense of murder and capital murder. *Cardenas v. State*, 30 S.W.3d 384, 392–93 (Tex.Crim.App.2000); *McGahey v. State*, 744 S.W.2d 695, 696 (Tex.App.-Fort Worth 1988, pet. ref'd). Furthermore, murder is a lesser included offense of capital murder, as we have previously held. *Zamora v. State*, 998 S.W.2d 290, 293 (Tex.App.-Fort Worth 1999, pet. ref'd); *see also Moore*, 969 S.W.2d at 12. Appellant has demonstrated that the offenses he requested are lesser included offenses of capital murder and therefore has met the first part of the test.

### Second Step

▇▇▇▇▇ We now turn to the second prong of the test—whether there is some evidence that would permit a rational jury to find that Appellant is guilty only of a lesser offense, and not of the greater offense. To make this determination, we must evaluate the evidence in the context of the entire record. *Moore*, 969 S.W.2d at 8. There must be some evidence from which a rational jury could acquit the defendant on the greater offense while convicting him of the lesser included offense. *Id.* The court may not consider whether the evidence is credible, controverted, or in conflict with other evidence. *Id.* If there is evidence from any source that negates or refutes the element establishing the greater offense, or if the evidence is so weak that it is subject to more than one reasonable inference regarding the aggravating element, the jury should be charged on the lesser included offense. *Schweinle v. State*, 915 S.W.2d 17, 19 (Tex.Crim.App. 1996); *Saunders v. State*, 840 S.W.2d 390, 391–92 (Tex.Crim.App.1992).

### Murder

▇▇▇▇ Here, for a rational jury to conclude that if Appellant was guilty of anything, he was *only* guilty of murder, there would have to be some evidence that Appellant committed the murder. There is, however, no direct evidence (and little circumstantial evidence) that Appellant did so. The only evidence linking Appellant to King is the DNA evidence. However, the presence of Appellant's semen in King's vagina demonstrates only that Appellant had sexual intercourse with King, whether consensual or nonconsensual, but does not demonstrate that he murdered King, especially in light of Krouse's testimony that the semen could have been there for several days before the murder. Appellant is therefore not entitled to an instruction on the lesser included offense of murder. We overrule Appellant's third point.

### Sexual Assault and Aggravated Sexual Assault

▇▇▇▇ On the other hand, there is some evidence that if Appellant is guilty of any

offense, he is guilty only of sexual assault or aggravated sexual assault. In deciding whether a lesser included offense instruction is warranted, we are required to view the evidence in the light most favorable to Appellant and give him the benefit of reasonable inferences from the evidence, without regard to whether it is credible, controverted, or in conflict with other evidence. *See Rousseau v. State,* 855 S.W.2d 666, 673 (Tex.Crim.App.1993); *Havard v. State,* 800 S.W.2d 195, 216 (Tex.Crim.App. 1989); *Upchurch v. State,* 23 S.W.3d 536, 540 (Tex.App.-Houston [1st Dist.] 2000, pet. ref'd).

Because the expert DNA witnesses could not pinpoint how old the semen was, there is some evidence that Appellant could have sexually assaulted King, without killing her, days or hours before her murder. Similarly, the medical examiner could not conclusively state that King's head wound occurred contemporaneously with her murder. Therefore, there is some evidence that Appellant could have committed aggravated sexual assault against King without killing her. West found the door to King's apartment ajar at 2:00 a.m. and could see broken glass and signs of a struggle inside. Polk testified, however, that the door was closed at 10:00 or 11:00 a.m. when he came by after King's alleged phone call to him to come board up her windows, and that even after he knocked on the door, it remained closed. Ball then testified that when he and Appellant arrived at King's shortly before they discovered her body, as soon as they knocked on the door, it immediately came open. According to this evidence, more than one person could have entered and exited King's apartment during the hours of 2:00 a.m. and 1:00 p.m. the day she was murdered. If more than one person entered and exited the apartment, more than one person could have sexually assaulted, strangled, and killed King.

Disregarding, as we must, whether the evidence that Appellant committed a lesser included offense is credible, controverted, or in conflict with other evidence, there is at least some evidence that if Appellant committed any offense he committed only the lesser included offense of sexual assault or aggravated sexual assault and not the greater offense of capital murder. Appellant was therefore entitled to a charge of sexual assault and aggravated sexual assault as lesser included offenses of capital murder. We sustain Appellant's fourth and fifth points.

### CONCLUSION

Having considered all of Appellant's points, we reverse Appellant's conviction and remand this case for a new trial.