[COMMENT1] 

 

 

 

 

 

                                      COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-05-102-CR

 

 

CLIFTON EARL CURTIS                                                         APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

           FROM
THE 297TH DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

                                            Introduction

Appellant Clifton Earl Curtis
appeals from his conviction and life sentence for aggravated sexual assaultCserious bodily injury.  In seven
points, Appellant asserts errors relating to voir dire, the exclusion and
admission of certain evidence, and the trial court=s refusal to charge the jury on a lesser included offense.  We affirm.

 








                                            Background

Gloria King was strangled to
death in her bed sometime on May 7, 1995. 
The medical examiner collected vaginal and perianal swab samples during
the autopsy of King=s body.  In 1997, police developed evidence allegedly implicating
Appellant, who is King=s nephew and
who reported her body to police, as a suspect in the killing while
investigating another homicide.  Although
Appellant denied that he ever had sexual intercourse with King, DNA from the
autopsy swabs matched Appellant=s DNA.  Appellant was tried and
convicted for capital murder in 2001.  On
appeal to this court, we reversed and remanded for a new trial, holding that
the trial court erred by failing to charge the jury on the lesser included
offenses of aggravated sexual assault and sexual assault.  See Curtis v. State, 89 S.W.3d 163,
179 (Tex. App.CFort Worth
2002, pet. ref=d).

On remand, Appellant was
tried for aggravated sexual assault, and the trial court charged the jury on
the lesser included offense of sexual assault. 
The jury convicted Appellant of aggravated sexual assault and sentenced
him to life in prison, and the trial court rendered judgment accordingly.

                                      Challenges for Cause








In his first two points,
Appellant argues that the trial court erred by overruling his challenges for
cause to two venirepersons who stated that they 
had friends who were the victims of crimes.  Venireperson McCoy, when asked whether her
experience would affect her ability to assess punishment, answered, AProbably.@  Venireperson Shoquist said that his
experience would cause him to lean towards the State.

A prospective juror who has a
bias or prejudice against any phase of the law upon which a party is entitled
to rely is properly challengeable for cause. 
Threadgill v. State, 146 S.W.3d 654, 667 (Tex. Crim. App.
2004).  The test is whether the bias or
prejudice would substantially impair the prospective juror=s ability to carry out his oath and instructions in accordance with
the law.  Id.  Before a prospective juror can be excused for
cause on this basis, however, the law must be explained to him and he must be
asked whether he can follow that law regardless of his personal views.  Id. 
Great deference is given to the trial court=s decision.  Id.

In this case, Appellant=s counsel did not explain the law to the veniremembers in question nor
ask whether they could follow the law regardless of their personal views.  We therefore defer to the trial court=s discretion and overrule Appellant=s first and second points.

                               Exclusion of Crime Lab Evidence








In his third point, Appellant
argues that the trial court erred by excluding the testimony of Treva
Armstrong, a former Fort Worth Crime Lab employee, regarding problems at the
crime lab when one of the State=s DNA expert witnesses, Aliece Watts, worked there.  The trial court excluded the evidence as
irrelevant.

We review a trial court=s ruling to admit or exclude evidence under an abuse of discretion
standard.  Weatherred v. State, 15
S.W.3d 540, 542 (Tex. Crim. App. 2000); Montgomery v. State, 810 S.W.2d
372, 391 (Tex. Crim. App. 1991) (op. on reh=g).  If the court=s decision falls outside the Azone of reasonable disagreement,@ it has abused its discretion.  Weatherred,
15 S.W.3d at 542; Montgomery, 810 S.W.2d at 391.

Watts performed the relevant
DNA analysis in 1998.  Armstrong was not
employed by the crime lab until 2000. 
Because Armstrong had no personal knowledge of any problems at the crime
lab at the time of the DNA tests relevant to this case, we cannot say that the
trial court abused its discretion by excluding Armstrong=s criticism of Watts=s later work.  We overrule
Appellant=s third
point.

Appellant=s fourth point also concerns Armstrong=s testimony.  Although the trial
court excluded Armstrong=s testimony
about problems at the crime lab, Armstrong did testify about her criticisms of
the methodologies employed by 








Watts in this case.  On cross-examination, the State questioned
Armstrong generally about various DNA-test methodologies.  Appellant argues that the State Aopened the door@ to Armstrong=s testimony about problems at the crime lab because some of those
methodologies were associated with the problems at the crime lab when Armstrong
worked there.

A witness opens the door to
otherwise inadmissible evidence if, while testifying, the witness creates a
false impression.  See Crenshaw v.
State, 125 S.W.3d 651, 656 (Tex. App.CHouston [1st Dist.] 2003, pet. ref=d).  In such a case, opposing
counsel may expose the falsehood.  See
id. (citing Delk v. State, 855 S.W.2d 700, 704 (Tex. Crim. App.), cert
denied, 510 U.S. 982 (1993)).  We
cannot see how the State=s general
questions about various DNA-test methodologies left the jury with a false
impression of anything.  Thus, we agree
with the trial court when it said, AI don=t think [the
State] opened the door to anything,@ and we overrule Appellant=s fourth point.

                                       YSTR DNA Testing

In his fifth point, Appellant
argues that the trial court erred by admitting the results of a particular DNA
test, the YSTR test, because the State failed to prove that the test was
relevant and reliable.  Specifically,
Appellant argues that there was no evidence that YSTR test results have been
admitted into evidence in a criminal trial anywhere in the United States and
that the evidence showed that the YSTR test is not standardized because
different labs use different markers for the test.













Rule 702 of the Texas Rules
of Evidence provides that Aif scientific, technical, or other specialized knowledge will assist
the trier of fact to understand the evidence or to determine a fact in issue, a
witness qualified as an expert by knowledge, skill, experience, training, or
education may testify thereto in the form of an opinion or otherwise.@  Tex. R. Evid. 702. 
Under Rule 702, the proponent of scientific evidence must show, by clear
and convincing proof, that the evidence he is proffering is sufficiently
relevant and reliable to assist the jury in accurately understanding other
evidence or in determining a fact issue. 
Weatherred, 15 S.W.3d at 542 (citing Nenno v. State, 970
S.W.2d 549, 560-61 (Tex. Crim. App. 1998)). 
Factors that could affect a trial court=s determination of reliability include, but are not limited to, the
following:  (1) the extent to which the
underlying scientific theory and technique are accepted as valid by the
relevant scientific community, if such a community can be ascertained; (2) the
qualifications of the expert(s) testifying; (3) the existence of literature
supporting or rejecting the underlying scientific theory and technique; (4) the
potential rate of error of the technique; (5) the availability of other experts
to test and evaluate the technique; (6) the clarity with which the underlying scientific
theory and technique can be explained to the court; and (7) the experience and
skill of the person(s) who applied the technique on the occasion in
question.  Kelly v. State, 824
S.W.2d 568, 573 (Tex. Crim. App. 1992). 
Before novel scientific evidence may be admitted under rule 702, the
proponent must persuade the trial court, by clear and convincing evidence, that
the evidence is reliable and therefore relevant.  Id. at 573.








The trial court conducted a Kelly
hearing on the YSTR evidence outside the jury=s presence.  William Watson
testified for the State.  Watson is the
forensic laboratory director for Orchid Cellmark, a DNA testing laboratory, and
holds a Bachelor of Science degree in microbiology and a Master of Science
degree in biology.  Watson testified that
YSTR employs the same technology as an older testCSTRCbut examines
genetic markers on the Y-chromosome, found only in males.  Bulding on research conducted by the National
Institute of Standards and Technology, Orchid Cellmark developed a set of ten
YSTR markers.  The markers are located on
regions of the DNA molecule that have been fully sequenced.  Other labs in the United States and Europe
have used the same YSTR markers since the mid-1990s.  YSTR underwent validation studies prior to
use in forensics, and those studies have been published in peer-review
journals.  Watson testified that there is
a general consensus in the scientific community that YSTR testing is reliable,
accurate, and valid.  On
cross-examination, Appellant established that different labs use different sets
of YSTR markers, but there is substantial overlap among the different
sets.  The State also called Cassie
Johnson at the Kelly hearing. 
Johnson is a forensic DNA analyst for Orchid Cellmark and holds a
Bachelor of Science degree in biology and chemistry, a Master of Science degree
in biomedical sciences, and a Master of Science degree in forensic
genetics.  Johnson was involved in
optimizing the YSTR markers for Orchid Cellmark, and she performed the YSTR
test on the DNA samples in this case.

At the conclusion of the Kelly
hearing, the trial court found that the YSTR methodology had been validated Ainternally and externally@ and subjected to peer review, that it was generally accepted in the
scientific community, and that the YSTR evidence was reliable and
relevant.  In light of the testimony
presented at the Kelly hearing, we hold that the trial court did not
abuse its discretion by determining that the YSTR evidence was reliable and
relevant, and we overrule Appellant=s fifth point.

                                Blood Sample Search Warrant

In his sixth point, Appellant
argues that the trial court erred by allowing a police detective to testify
that he collected a sample of Appellant=s blood pursuant to a search warrant. 
Appellant argues that testimony about the search warrant was not
relevant because he voluntarily submitted a blood sample and was prejudicial
because it left the jury with the impression that he did not cooperate with
police.








Nothing in the record, apart
from the argument of Appellant=s counsel to the trial court, suggests that Appellant voluntarily
submitted a blood specimen for DNA testing. 
A major thrust of Appellant=s theory of defense was that the State mishandled the DNA evidence in
this case.  Thus, the circumstances under
which the State obtained DNA from Appellant was relevant to issues before the
jury.  We therefore hold that the trial
court did not abuse its discretion by allowing the detective to testify about
the search warrant, and we overrule Appellant=s sixth point.

                                    Lesser Included Offense








In his seventh point, Appellant
argues that the trial court erred by failing to charge the jury with the lesser
included offense of aggravated assault.       To
determine whether a jury must be charged on a lesser included offense, we apply
a two-step analysis.  Salinas v. State,
163 S.W.3d 734, 741 (Tex. Crim. App. 2005); Moore v. State, 969 S.W.2d
4, 8 (Tex. Crim. App. 1998).  The first
step is to decide whether the offense is a Alesser included offense@ as defined in article 37.09 of the code of criminal procedure.  Tex.
Code Crim. Proc. Ann. art. 37.09 (Vernon 1981); Salinas,163
S.W.3d at 741; Moore, 969 S.W.2d at 8. 
AAn offense is a lesser included offense if . . . it is established by
proof of the same or less than all the facts required to establish the
commission of the offense charged.@  Tex. Code Crim. Proc. Ann. art. 37.09(1).  Here, the State concedes that aggravated
assault can be a lesser included offense of aggravated sexual assault.

Second, some evidence must
exist in the record that would permit a jury to rationally find that if the
defendant is guilty, he is guilty only of the lesser offense.  Salinas,163 S.W.3d at 741; Rousseau
v. State, 855 S.W.2d 666, 672‑73 (Tex. Crim. App.), cert. denied,
510 U.S. 919 (1993); Royster v. State, 622 S.W.2d 442, 446 (Tex. Crim.
App. 1981).  The credibility of the
evidence and whether it conflicts with other evidence or is controverted may
not be considered in determining whether the lesser included offense should be
submitted.  See Gadsden v. State,
915 S.W.2d 620, 622 (Tex. App.CEl Paso 1996, no pet.). 
Regardless of its strength or weakness, if more than a scintilla of
evidence raises the issue that the defendant was guilty only of the lesser
offense, the charge must be given.  Bignall
v. State, 887 S.W.2d 21, 23 (Tex. Crim. App. 1994); Saunders v.
State, 840 S.W.2d 390, 391 (Tex. Crim. App. 1992).  In deciding whether a lesser included offense
instruction is warranted, we are required to view the evidence in the light
most favorable to Appellant and give him the benefit of reasonable inferences
from the evidence, without regard to whether it is credible, controverted, or
in conflict with other evidence.  Curtis,
89 S.W.3d at 179.








An accused is guilty only of
a lesser included offense if there is evidence that affirmatively rebuts or
negates an element of the greater offense or if the evidence is subject to
different interpretations, one of which rebuts or negates the crucial
element.  See Schweinle v. State,
915 S.W.2d 17, 19 (Tex. Crim. App. 1996); Ramirez v. State, 976 S.W.2d
219, 226-27 (Tex. App.CEl Paso
1998, pet. ref=d).  It is not enough that the jury may disbelieve
crucial evidence pertaining to the greater offense.  See Skinner v. State, 956 S.W.2d 532,
543 (Tex. Crim. App. 1997), cert. denied, 523 U.S. 1079 (1998).  A charge on the lesser offense is not
required if a defendant=s evidence
suggests that he committed no offense at all. 
Lofton v. State, 45 S.W.3d 649, 652 (Tex. Crim. App. 2001)
(citing Bignall, 887 S.W.2d at 23 (Tex. Crim. App. 1994)).        A person commits the offense of
aggravated sexual assault if the person causes the penetration of another=s sexual organ without the other=s consent and causes serious bodily injury to the victim in the course
of the same criminal episode.  Tex. Penal Code Ann. ' 22.021 (Vernon 2004).  A person
commits the offense of aggravated assault if the person intentionally,
knowingly, or recklessly causes serious bodily injury to another.  Id. '' 22.01, 22.02 (Vernon 2004).

Appellant argues that he was
entitled to a charge on aggravated assault because the medical examiner
testified on cross-examination as follows:








Q:  [W]hen you find semen in the vagina of the
deceased, can you determine when it got there in relation to when the person
died?

 

A:  No.

 

Q.  Up to how many days prior to the death could
it be?

 

A.  There have been reported examples of even
identifiable viable moving sperm recovered from the woman=s
vagina as much as three or four days after intercourse.

 

Appellant contends that this testimony raises the
possibility that Appellant had sexual intercourse with King days before she was
murdered; thus, the penetration of her sexual organ may not have occurred Ain the same criminal transaction@ as the serious bodily injury that resulted in her death.  See Tex.
Penal Code Ann. ' 22.021.








We agree that the testimony
in question raised the possibility of a temporal separation between the time
Appellant had sex with King and the time of her death, but we disagree that
this possibility entitled him to a charge on the lesser included of aggravated
assault.  The DNA evidence that Appellant
had sexual intercourse with KingCdespite his repeated statements that he had never done soCwas the same evidence and virtually the only evidence that pointed to
Appellant as King=s
killer.  The fact of King=s death by strangulation was the key evidence tending to prove that
Appellant sexually assaulted her, as opposed to engaging in consensual
intercourse with her.  If Appellant
engaged in sexual intercourse with King days before death rather than at the
time of her death, then the only reasonable and logical conclusion to be drawn
from the evidence is that he neither sexually assaulted her nor killed
her.  It is the combination of Appellant=s DNA on King=s body and
the circumstances of King=s death that
points to aggravated sexual assault as the crime and to Appellant as the
perpetrator.  Thus, if the medical
examiner=s testimony suggests that Appellant could have had sexual intercourse
with King as many as four days before her death, then it suggests that he
committed no crime at all.  We therefore
hold that the trial court did not err by denying Appellant=s request for a charge on aggravated assault, and we overrule his
seventh point.

                                             Conclusion

Having overruled all seven of
Appellant=s points, we
affirm the trial court=s judgment.

ANNE GARDNER

JUSTICE

PANEL B:   DAUPHINOT, HOLMAN, and
GARDNER, JJ.

DAUPHINOT, J. filed a dissenting opinion.

PUBLISH

DELIVERED: 
August 31, 2006

 

 

 











 
 
 
 
 
 
 
 
 
 
 
 
 
  
 




 

 

                                               COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-05-102-CR

 

 

CLIFTON EARL CURTIS                                                         APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

           FROM
THE 297TH DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                   DISSENTING
OPINION

 

                                              ------------

I must respectfully dissent
from the majority=s
disposition of Appellant=s third and
fourth points because the majority appears to misconstrue Appellant=s purpose for offering the evidence that the trial court excluded.  

As the majority concedes, 








The
DNA evidence that Appellant had sexual intercourse with King [the complainant]
. . . was the same evidence and virtually the only evidence that pointed to
Appellant as King=s
killer.  The fact of King=s
death by strangulation was the key evidence tending to prove that Appellant
sexually assaulted her, as opposed to engaging in consensual intercourse with
her.  If Appellant engaged in sexual
intercourse with King days before death rather than at the time of her death,
then the only reasonable and logical conclusion to be drawn from the evidence
is that he neither sexually assaulted her nor killed her. It is the combination
of Appellant=s DNA
on King=s
body and the circumstances of King=s death that points to
aggravated sexual assault as the crime and to Appellant as the
perpetrator.  Thus, if the medical
examiner=s
testimony suggests that Appellant could have had sexual intercourse with King
as many as four days before her death, then it suggests that he committed no
crime at all.[1]

 

The State offered Aliece
Watts as both a fact witness and an expert witness to lay the predicate for
admissibility of the DNA evidence.  Watts
had packaged and tested the DNA samples that connected Appellant to the case
now before this court.  Watts testified
that Appellant alone donated the only DNA present in the vaginal and perineal
swabs from the complainant.  Yet Charles
Moody admitted that he had had sexual intercourse with the complainant on the
night that she was killed and that he had ejaculated. Nothing other than Watts=s testimony about the DNA tied Appellant to the sexual assault of the
complainant.  








The deputy medical examiner,
Marc Krouse, testified that the complainant had been dead at least sixteen to
eighteen hours at the time his office examined her, but that he could not
determine when, in relation to her death, the semen, which Watts linked only to
Appellant, had been deposited.  Krouse
testified that the semen could have been as much as four days old at the time
of his examination.

The proponent of the scientific evidence bears the burden
of demonstrating by clear and convincing evidence that the evidence is
reliable.[2]  AThis is
accomplished by showing:  (1) the
validity of the underlying scientific theory; (2) the validity of the technique
applying the theory; and (3) proper application of the technique on the
occasion in question.@[3]








Watts discussed the
development of DNA testing in general, the history of DNA testing in the Fort
Worth Police Crime Lab, and the procedure that she claimed to have followed
generally and specifically as related to the case now before this court.  Appellant objected that Watts had not been
qualified as an expert in this field. 
The trial court overruled the objection and granted Appellant=s request for a running objection to all such testimony by Watts.     The defense also attempted to inform the
jury of ongoing problems with mislabeling and mishandling of evidence through
the testimony of Treva Armstrong, who had worked in the crime lab, although she
was not there at the time Watts performed the specific tests regarding Appellant.  Armstrong was qualified as an expert and
prepared to testify to persistent problems with the lab equipment and to
recurring problems in procedure and methodology that compromised the validity
of the testing done in the lab and the integrity of the samples that were
received and stored.

Armstrong was also prepared
to testify about the contents of an affidavit regarding her concerns with Watts
and the crime lab that she had prepared in 2002 in response to the chief of
police=s request.  The affidavit=s contents stated her concern about the large number of cases that
were uncompleted at the time.  It stated
that Watts was working on nine to eleven cases simultaneously.  Armstrong stated that Watts had only
completed two of these and that

[o]ne
of the two cases had to be completely repeated due to lack of good judgment
and/or poor quality . . . .  The other
case had to be taken outside of the lab to an independent DNA expert because
[Watts and another employee] could not come to an agreement as to the results
of [Watts=s]
testing.

 

AThe other remaining DNA cases that Mrs. Watts started back in 2001
have either pled and/or been reworked.@  The affidavit stated that
Watts consistently gave false impressions to defendants and/or their attorneys
about how far along their testing process was.








Jaime King testified that she had worked with Watts in the Fort Worth
Crime Lab and that sometime during the period of October 1995 to January 1996,
King had performed DNA testing on the vaginal swab and the perineal swab of
Gloria King using the RFLP method. 
Because Athere was a
lot of degradation, it wasn=t a very good quality sample,@ so King obtained no results from testing those two items.  Watts performed another kind of DNA testing
on the Gloria King swabs in 1995, 1996, and 1998 and still obtained no
results.  Watts also admitted to errors
in recording dates, procedures, and results of testing.  Watts also testified that she was working on
several cases at the same time.  Finally,
in October 1998, the Fort Worth Crime Lab turned over the testing in this case
to GeneScreen.

The problems of quality control in the lab were so serious that both
the district attorney=s office and
the police conducted an investigation of the lab. 

The defense attempted to challenge the reliability of Watts=s announced testing results by showing, through Armstrong=s testimony, that the lab equipment was faulty, that contamination of
samples was a pervasive problem, that Watts often did not follow proper
protocol, that Watts often made mistakes in procedure, that she consistently
misled defendants and/or their attorneys about the status of the testing
process, that she had too many uncompleted cases and worked on too many cases
at the same time, and that her work often had to be reworked or sent to an
outside lab.  The defense also attempted
to use Armstrong=s testimony
to show Watts=s bias in
reporting results that would benefit the prosecution.








Clearly, the credibility of an expert witness is a material issue,[4]
whether the credibility is challenged by showing a history of misleading
statements that benefitted one side to the detriment of the other, a failure to
follow proper protocol, carelessness in performing testing and/or reporting of
results, or a history of errors resulting in compromised results.

The Sixth Amendment to the United States Constitution guarantees the
right of an accused in a criminal prosecution to confront the witnesses against
him.[5]  The right of confrontation encompasses more
than the opportunity to physically confront the witnesses.[6]  A primary interest secured by the
Confrontation Clause is the right of cross‑examination.[7]








Cross‑examination is the principal means by which the
believability of a witness and the truth of his testimony are tested.[8]  The cross‑examiner not only is
permitted to delve into the witness=s story to test the witness=s perceptions and memory, but also is traditionally allowed to
impeach, that is, discredit, the witness.[9]  Consequently, the right to cross‑examine
a testifying State=s witness
extends to any matter that could reflect on the witness=s credibility.[10]  This right therefore includes impeaching the
witness with relevant evidence that might reflect bias, interest, prejudice,
inconsistent statements, traits of character affecting credibility, or
impairment or disability affecting the witness=s credibility.[11]  The trial judge should allow the accused
great latitude to show any relevant fact that might tend to affect the witness=s credibility.[12]








Appellant should have been allowed to impeach the reliability of Watts=s work, the likelihood of contamination of samples, and the
reliability of the quality of the samples she provided GeneScreen through the
affidavit and through Armstrong=s testimony.  Just as an expert=s appraisal reports for comparable properties prepared for prior
condemnation proceedings were relevant and discoverable to show his bias in a
subsequent appraisal,[13]
Watts=s pattern of errors and improper protocols in other cases were
relevant and admissible to impeach her credibility as a fact witness and an
expert witness.  Because the majority
does not so hold, I must respectfully dissent.

 

 

 

LEE
ANN DAUPHINOT

JUSTICE

PUBLISH

DELIVERED:  August 31, 2006

 











[1]Majority
op. at 12-13.





[2]Jackson
v. State, 17 S.W.3d 664, 670 (Tex. Crim. App. 2000).





[3]Id.
(citation omitted).





[4]Cf. Ex
parte Shepperd, 513 S.W.2d 813, 816 (Tex. 1974) (in condemnation case,
holding that other appraisals of similar property are discoverable because they
are material to the issue of the appraiser=s credibility).





[5]U.S. Const. amend. VI; Crawford v.
Washington, 541 U.S. 36, 42, 124 S. Ct. 1354, 1359 (2004); Davis v.
Alaska, 415 U.S. 308, 315, 94 S. Ct. 1105, 1110 (1974); Rankin v. State,
41 S.W.3d 335, 344 (Tex. App.CFort Worth 2001, pet. ref=d).





[6]Davis, 415
U.S. at 315, 94 S. Ct. at 1110.





[7]Id.





[8]Id. at
316, 94 S. Ct. at 1110.





[9]Id.





[10]Virts
v. State, 739 S.W.2d 25, 28‑29 (Tex. Crim. App.
1987).





[11]Id. at
29; Rankin, 41 S.W.3d at 345; Alexander v. State, 949 S.W.2d 772,
774‑75 (Tex. App.CDallas
1997, pet. ref=d).





[12]Virts, 739
S.W.2d at 29; Koehler v. State, 679 S.W.2d 6, 9 (Tex. Crim. App. 1984).





[13]Shepperd, 513
S.W.2d at 816.















 [COMMENT1]

Majority by Justice Gardner

Dissent by Justice Dauphinot