# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00422-CR

**Jeffrey Fields, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 390TH JUDICIAL DISTRICT
### NO. 9034186, HONORABLE JULIE H. KOCUREK, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Jeffrey Fields was convicted of three counts of burglary of a habitation with the intent to commit sexual assault and theft. *See* Tex. Pen. Code Ann. § 30.02 (West 2003). He appeals, claiming in three issues that the trial court reversibly erred by admitting into evidence (1) a letter and a poem, allegedly authored by appellant, which were not properly authenticated; (2) testimony of an extraneous offense, which was unduly prejudicial and not sufficiently similar to the alleged offense as to be relevant to the element of intent; and (3) identification testimony, which was based on an impermissibly suggestive photographic array. Because the trial court did not abuse its discretion in admitting this evidence, we affirm the judgment.

**BACKGROUND**

The complainant, identified by the pseudonym "R. Brown" at trial, was staying at the Habitat Suites in Austin over the course of a few weeks in December 2002.[1]  After identifying appellant in court, Brown testified that on December 19, between 5:30 and 5:45 in the evening, she passed appellant in the hotel parking lot and saw him go up a stairway.  Brown stopped in her room and then proceeded to the hospitality bar in the lobby, where she got a cup of wine, which she took back to her room.  After Brown watched television and worked on her laptop for about an hour, appellant knocked and requested, through the closed door, that Brown lend him an egg and some sugar.  When Brown attempted to tell appellant that she did not have what he needed, he motioned as though he could not hear what she was saying.  Brown testified that she then "cracked the door open a little bit," put her foot behind it because the door did not have a chain lock, and repeated that she did not have the items.  She testified that appellant then made an expression that made her fearful and she attempted to slam the door shut, but he "beat [her] to it," shoving himself inside and slamming the door behind him, automatically locking the door.

Brown fell to the floor and attempted to fight off appellant by biting the hand that he had placed over her mouth, which caused appellant to bleed, and by kicking the door and walls to make noise.  She testified that appellant put a plastic sack over her head and attempted to choke her.  When Brown was able to rip the bag off, she began praying.  As Brown laid on the floor and prayed

---

[1]  The Habitat Suites offers extended-stay accommodations; its rooms are similar to small apartments including a bedroom, living area, and kitchenette.  Brown had stayed at the property frequently for a business project that she was working on in Austin.  She testified that the night of the offense was to be her last night in Austin before returning home to her husband for Christmas.

2

aloud, appellant knelt or stood over her and masturbated until he ejaculated on the sweatshirt Brown was wearing. Next, appellant paced the room, apologized, and explained that he had a drug problem and "he really wasn't a bad person." He eventually laid down beside Brown, who continued to pray. Appellant then told Brown that he would not hurt her anymore if she would give him her car and some money. Brown initially refused but, because she "wanted to live more than [she] wanted the car," she gave him the keys, a few dollars, and a credit card.

Police later found Brown's car in the possession of Corey Webb, who "rented" the car from appellant on multiple occasions in exchange for money or crack cocaine. The credit card was discovered on Ariel Gillo, who spent three days with appellant and helped arrange the "rental" between him and Webb. Both Webb and Gillo identified appellant in court as the man from whom the car and credit card were obtained. After appellant attempted to impeach Webb's identification, the State offered the photographic array from which Webb had previously selected appellant's picture. Gillo had also selected appellant from the same photos, and the State also offered Gillo's photographic identification as an exhibit. Appellant moved to suppress these identifications, claiming the arrays were impermissibly suggestive based on differences in the photographic quality of appellant's picture compared to the other five pictures. The court denied the motion, allowed the testimony, and admitted the two copies of the photographic array.

Appellant also objected to the admission of a letter and a poem, allegedly written by him, on the ground that the documents could not be properly authenticated without a handwriting expert. The trial court overruled the objection, agreeing with the State that, pursuant to Rule 901(b)(4), the document was authenticated by its distinctive characteristics because its content

3

included facts that appellant would have special knowledge of, it was signed by appellant, and it had appellant's personal identification information listed on the envelope's return address. *See* Tex. R. Evid. 901(b)(4).

Appellant also objected to the testimony of L.S., the victim of a sexual assault for which appellant was convicted in 1992. Appellant urged that this extraneous offense evidence was irrelevant because he had not "opened the door" on the issue of intent and that, even if he had, the facts of the extraneous event were not sufficiently similar to the facts of the charged offense to satisfy Rules 402, 403 and 404(b). *See id.* 402 (evidence generally admissible if relevant), 403 (probative value versus prejudicial effect), 404(b) (extraneous offense admissible to prove intent, not conduct in conformity therewith); *see also id.* 401 (defining relevant evidence). After determining that the element of intent was at issue and that the facts of the two offenses were sufficiently similar, the trial court overruled the objection and allowed the testimony.

**ANALYSIS**

Appellant urges this Court to reverse his conviction and remand for a new trial, claiming that the trial court committed reversible error by admitting into evidence the letter and poem, the extraneous offense testimony, and the photographic identification testimony. The admissibility of evidence is within the trial court's discretion and we will not reverse its decision absent an abuse of discretion. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). Thus, we will affirm as long as the trial court's ruling was within the zone of reasonable disagreement. *Id*. (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991)).

4

**Authentication—Rule 901(b)(4)**

At trial, the State called Detective Kimberly Farbo, the sex crimes investigator who handled Brown's case. During the State's examination of Farbo, the prosecutor approached the bench and notified the court of his intention to introduce a handwritten letter and poem that were allegedly written by appellant and mailed from his jail cell to the detective.[2] Appellant objected to the authenticity of the document, claiming that the State could not prove that Fields wrote it without a handwriting expert. The State urged that the document's unique characteristics, in comparison to the facts of the case at bar, authenticated the document under Rule 901(b)(4). *See* Tex. R. Evid. 901(b)(4).

The letter states,

Detective Farbo,

I have sent this poem to you in hope that you will forward it to Ms. "Brown." She helped to change my life so I wanted to share the poem I wrote about her with her. I am truly sorrowful to her and her husband for the drug-crazed behavior I exhibited. I pray for her mercy and forgiveness. I know that you will give this letter and poem to the D.A.'s office, but that is okay too. God bless you forever.

---

[2] At the bench, the prosecutor stated: "Judge, I intend to offer this through the detective, and I just wanted to bring [it] up here first because once I bring it out, it is pretty much out there." Defense counsel objected to the document on the grounds that it was irrelevant, unduly prejudicial, and hearsay. The trial court overruled those objections, stating that it was relevant, highly probative, and an admission of a party opponent. The trial court then asked the State whether it would "be able to prove that [appellant] wrote it," to which the State responded affirmatively, and appellant said "[a]uthenticity is a big question." At that point, the trial court decided to hold a hearing outside the presence of the jury to address these objections.

The attached poem is titled "Oblivious to Obvious." It recounts that the author was "oblivious" to the fact that he was living a miserable and sin-filled life, and that God had sacrificed for him and was his friend, until "a believer told me of a much better way; she taught me to get on my knees and pray," concluding that it became "obvious" his "life has been saved by His grace" when God "answered her prayer." The poem is signed, "Thank you Lord, Jeff Fields." The letter was sent via the United States Postal Service; the envelope's return address included "Jeff Fields, 4363, 0313770"—the appellant's name, birth date, and jail identification number—followed by the street address for the Del Valle Correctional Center, where appellant was incarcerated. Appellant urges that the trial court committed reversible error by admitting these documents.

Rule 901 requires that a condition precedent to the admission of any piece of evidence is that it be sufficiently authenticated or identified to demonstrate that the matter in question is what its proponent claims it to be. *Id*. 901(a). Section (b)(4) states that this authentication requirement can be satisfied by "distinctive characteristics and the like"; the "appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances," can be used to prove the document's authenticity. *Id.* (b)(4). A signature on a document is insufficient, on its own, to authenticate a document. *Hislop v. State*, 64 S.W.3d 544, 546 (Tex. App.—Texarkana 2001, no pet.). However, when the signature is coupled with the alleged author's personal information in the return address, oral statements by the alleged author that are parallel to the written ones, and other identifying characteristics, then the document is distinct enough to make a finding that it is what the proponent claims. *See id*.; *see also Angelton v. State*, 971 S.W.2d 65, 68 (Tex. Crim. App. 1998) (tape recording authenticated based on speaker's discussion of matters that he had

6

special knowledge of and were unlikely to be known by others); *City of Corsicana v. Herod*, 768 S.W.2d 805, 815 (Tex. App.—Waco 1989, no writ) (characteristics of document at issue were distinctive enough to authenticate it).

It was within appellant's special knowledge that (1) Farbo was the detective handling the case, (2) the victim had been designated the pseudonym "Brown" for the purposes of this case, (3) the victim had a husband, (4) appellant was on drugs at the time of the offense, (5) the letter would be sent to the district attorney because charges had been brought against appellant for the offense, (6) Brown's decision to pray aloud during the offense deterred appellant from harming her further, and (7) appellant was apologetic for his actions, as he stated immediately after sexually assaulting Brown. It is not only the letter's and poem's contents that suggest appellant is the author; the document was also signed by appellant and the envelope listed appellant's specific, personal identification information, such as his birth date and inmate number. Although it is possible that another person knew or had access to this information, taking the facts as a whole, it was reasonable for the trial court to determine that, more likely than not, the letter and poem were what the State purported them to be—writings of the appellant. The trial court did not abuse its discretion by admitting the documents. Appellant's first issue is overruled.[3]

---

[3] Appellant urges that reversible error is demonstrated by the trial court's comment that a "handwriting expert is the best way to get it in." While this may be the preferred practice, the rules of evidence allow a document to be authenticated based on its distinctive characteristics and do not require the use of a handwriting expert. The trial court did not abuse its discretion by admitting the document pursuant to Rule 901(b)(4).

**Extraneous Offense Evidence—Rules 402, 403, and 404(b)**

During the first day of testimony, the State notified the court and appellant of its intention to call L.S., the victim of a 1992 sexual assault for which appellant had been convicted in San Antonio. The State urged that "the circumstances of that incident are similar enough to where . . . it would be very relevant to the jury in determining [appellant's] intent to commit sexual assault [against Brown] on December 19, 2002." Appellant responded that the admission of L.S.'s testimony should be "contingent upon [him] opening the 404(b) door," meaning that if he did not dispute the element of intent, then any probative value of the extraneous offense evidence would be overcome by its prejudicial effect. *See* Tex. R. Evid. 403, 404(b). The trial court determined that a hearing on the matter would be necessary. The next day, prior to the hearing, the judge informed the parties that she had found a case that was "pretty similar to this case" and asked the attorneys to review it. *See Corley v. State*, 987 S.W.2d 615, 619-20 (Tex. App.—Austin 1999, no pet.) (holding that evidence of sexual assault occurring thirteen years prior was admissible to show intent to commit instant sexual assault because facts of extraneous offense were substantially similar and because intent was essential element for which State lacked alternative sources of proof).

At the hearing, which was held outside the jury's presence, L.S. testified about the facts of the offense that occurred during the afternoon of June 19, 1992. L.S. identified the appellant as the man who assaulted her and testified that she had never seen him before that day, when he passed her in the parking lot of her apartment complex. She testified that approximately ten minutes after they passed, she returned to her apartment. As L.S. was walking up the stairs, she heard appellant say, "excuse me." She stopped on the landing one floor above appellant, and he requested

8

to use her phone. At first, L.S. hesitated and told appellant there was a phone at the apartment's office or pool. After appellant claimed to have already tried that and assured her he would be "real quick," she agreed and left her door open. L.S. testified that after appellant entered the apartment, she began "feeling weird" because he just kept dialing and never talking. L.S. told appellant that she was in a hurry and began to escort him toward the door. Appellant then "slammed the door shut and started attacking [L.S.]." She fought back but appellant threw her on the floor of a walk-in closet, climbed on top of her, and ripped her pants off. She did not remember if appellant tried to choke her. L.S. testified that appellant "had his finger in me and then he tried to press [his penis] up against me and then he ended up ejaculating. . . . [T]hen he stopped and kind of apologized . . . just saying he was sorry and that he was on something . . . ." He did not make any religious comments to her and did not steal any property from her.

Following L.S.'s testimony, the court questioned the parties about appellant's activities during the ten-year period between the two offenses. The State offered evidence that appellant had been incarcerated from August 29, 1992 until August 3, 2002. The court noted that, although the offenses occurred a decade apart, due to appellant's incarceration, there were only about four months from 1992 to 2002 during which appellant was free. The court further noted that, at the time of the offenses, the victims were both brunettes who were approximately the same age as appellant, but that L.S. was approximately five feet and three inches tall and 108 pounds, while Brown was approximately five feet and nine inches tall and 145 pounds.

After hearing argument from both the State and appellant, the trial court ruled that the extraneous offense evidence satisfied Rules 401-404(b), and permitted L.S. to testify before the

jury. Prior to her testimony, the court granted appellant a running objection and gave the jury a limiting instruction to consider the evidence solely for the purpose of determining intent. L.S. then testified to same facts as recited during the hearing. Appellant urges that the trial court committed reversible error by admitting this testimony because it violated Rules 402, 403, and 404(b).

Rule 404(b) states that "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, . . . or accident." Tex. R. Evid. 404(b); *see Rankin v. State*, 974 S.W.2d 707, 718-19 (Tex. Crim. App. 1998). To be admissible for such an alternative purpose, the evidence must have relevance apart from character conformity and its probative value must not be substantially outweighed by the danger of unfair prejudice. *See* Tex. R. Evid. 401-404(b); *Johnson v. State*, 145 S.W.3d 215, 220 (Tex. Crim. App. 2004).

Extraneous offense evidence offered to prove intent is relevant "where intent is a material issue and it is not inferable from the act itself." *Rankin*, 974 S.W.2d at 719. "Intent is contested when a defendant accused of sexual assault raises the defensive theory of consent." *Rickerson v. State*, 138 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2004, no pet.). Such evidence is not relevant, however, if the State's direct evidence clearly establishes the intent element and that evidence is not contradicted by appellant nor undermined by appellant's cross-examination of the State's witnesses. *Id.*; *see also* Tex. R. Evid. 401 (evidence is "relevant" if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence").

For the extraneous offense evidence to be relevant to the issue of intent, the prior acts must be sufficiently similar to those at issue. *Rickerson*, 138 S.W.3d at 531. This is derived from the doctrine of chances—"it is the improbability of a like result being repeated by mere chance that gives the extraneous offense probative weight." *Brown v. State*, 96 S.W.3d 508, 512 (Tex. App.—Austin 2000, no pet.); *see also Rickerson*, 138 S.W.3d at 531 ("it is the mere repetition of instances, and not their system or scheme, that satisfies our logical demand") (quoting *Plante v. State*, 692 S.W.2d 487, 491-92 (Tex. Crim. App. 1985)). The degree of similarity required for the purpose of proving intent is a lesser standard than where the purpose of the evidence is to prove the perpetrator's identity or *modus operandi*. *Brown*, 96 S.W.3d at 512. In addition to the factual similarities between the extraneous and charged offenses, the court should also consider their temporal proximity. *Corley*, 987 S.W.2d at 619-20 (period of incarceration is material to consideration of the closeness in time between the two offenses). However, "remoteness or dissimilarity do not *per se* render an extraneous offense irrelevant. The extraneous offense and the charged offense can, therefore, be different offenses, so long as the similarities between the two are such that the evidence is relevant." *Thomas v. State*, 126 S.W.3d 138, 144 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

The relevance of L.S.'s extraneous offense testimony was established because intent to commit sexual assault was a material element that the State was required to prove beyond a reasonable doubt, and intent was not inferable from proof of the act itself because appellant challenged the issue of intent in his opening statement and cross-examination of the State's witnesses. *Brown*, 96 S.W.3d at 512 (State required to prove intent in sexual assault case, and intent

11

cannot be inferred from act of intercourse with victim where defensive theory of consent asserted); *Corley*, 987 S.W.2d at 619 (because intent is essential element of sexual assault, intent was elemental fact of case); *see also* Tex. Pen. Code Ann. § 30.02 (offense of burglary committed if, "without the effective consent of the owner," appellant "enters a habitation . . . with intent to commit a felony, theft, or an assault . . . .").

Although appellant urged that he "made assiduous efforts to not raise intent," he implied during his opening statement that Brown consented to the events at issue by stating that "she opened the door to Mr. Fields [and] Mr. Fields entered . . . and not only were the credit cards given to Mr. Fields, but the car keys were given to Mr. Fields." Appellant again suggested that Brown's actions were voluntary during his cross-examination of her, characterizing the events as: Brown had "some volume of wine" before she "opened the door and Mr. Fields stepped in," and "he didn't physically manipulate or harm [Brown] in any way to acquire" the credit cards or car keys. Additionally, when cross-examining the State's DNA expert—who had testified that, to a reasonable degree of scientific certainty, appellant was the source of the semen stains found on Brown's sweatshirt—appellant urged that, even though the expert could say with a high probability that appellant deposited the semen, he could not testify to the circumstances under which the deposits were made, including what appellant's mental state was at the time. Thus, appellant sought to imply that Brown consented to the sexual activity, thereby challenging the element of intent and opening the 404(b) door. *See Rickerson*, 138 S.W.3d at 531 (because defendant raised defensive theory of consent, extraneous offense evidence was admissible to show intent); *see also Wheeler v. State*, 67

S.W.3d 879, 884 n.9 (Tex. Crim. App. 2002) ("implicit inference" elicited through cross-examination was sufficient to "open the door").

Appellant also challenged the relevancy of L.S.'s testimony on the grounds that the facts of the extraneous offense were not sufficiently similar to those of the charged offense. The trial court, however, held a hearing and determined that the nature of the two offenses was sufficiently similar and, in accordance with *Corley v. State*, overruled appellant's objection. *See* 687 S.W.3d 615. In *Corley*, this Court determined that an extraneous sexual assault was substantially similar to the charged sexual assault because, in both instances, the appellant followed the victim home without her consent, the victims were young and not acquainted with the appellant, the attacks occurred at night as the victims were getting out of their cars in the parking lots of their apartment complexes, and the appellant shoved a rag in the victims' mouths and threatened to kill them. *Id*. at 619. The extraneous offense was relevant despite some differences from the charged offense; in only one attack did the appellant use a weapon, drag the victim to the woods, make numerous sexual advances, and attempt to rape her. *Id*. at n.2 (extraneous offense "need only be substantially similar, . . . not exactly the same as the offense charged"). Similarly, in *Rickerson v. State*, the court determined that sufficient similarities existed between an extraneous and a charged sexual offense because both attacks involved victims who were about thirteen-years old, acquainted with the appellant, surprised by his attack, and who resisted him; and both attacks were perpetrated by straddling the victims and holding their arms down. 138 S.W.3d at 531.

Here, in both the 1992 offense and the 2002 offense, appellant first encountered the victims in the parking lot of their residences, waited for the victims to return to their rooms alone,

13

and then approached them under the guise of needing help—once requesting cooking supplies and once asking to use the phone. In both instances, the victims were brown-haired women who were approximately the same age as appellant and not acquainted with him. In both attacks, the appellant forced the victims' doors closed, was not deterred by the victims' resistance, and knocked them to the floor, where he made advances toward raping them but ejaculated before penetration. Both attacks occurred fairly immediately after appellant gained access to the victims' rooms. Following both attacks, appellant apologized to the victims and blamed his behavior on substance abuse. Moreover, when considering that appellant was incarcerated for ten years in between the 1992 and 2002 attacks, leaving him only about four months to be free in society during that time, the attacks occurred in close proximity to one another. *See Corley*, 687 S.W.3d at 620 (intervening period of incarceration should be considered in proximity inquiry). The similarities between these offenses are substantial enough to satisfy the relevancy inquiry; the degree of similarity between the extraneous and charged offenses here is equal to that found in both *Corley* and *Rickerson*.[4]

Even if the extraneous offense evidence is relevant and being offered for a permissible purpose under Rule 404(b), it may still be excluded if it fails to satisfy the balancing test under Rule 403. *Moses*, 105 S.W.3d at 626. To determine whether the probative value of an

---

[4] Appellant urges the following distinctions between the 1992 and 2002 offenses: (1) one occurred in the afternoon, the other occurred in the evening, (2) one victim was short, the other was tall, (3) once appellant entered the room with the victim, the second time he knocked to gain entry, (4) one attack did not involve theft, while the other did, (5) once appellant attempted to choke the victim, whereas the other victim could not recall if he attempted to choke her, (6) one attack involved blood—because the victim bit appellant—and the other did not involve blood, and (7) once appellant made religious comments—in response to the victim's praying—and the other time he did not. These differences are slight and, especially given that some are focused on the victim's reaction rather than on appellant's attack, they do not lessen the overall similarity between the two offenses.

14

extraneous offense is outweighed by its prejudicial effect, we consider how compellingly the evidence makes a material fact more or less probable, how likely it is that the evidence will impress the jury in some irrational but indelible way, how much time the State will require to develop the evidence, and how great the State's need for the evidence is. *Wheeler*, 67 S.W.3d at 888; *Montgomery*, 810 S.W.2d at 389-90. An "impermissible inference of character conformity can be minimized through a limiting instruction." *Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996); *see also Hammock v. State*, 46 S.W.3d 889, 894 (Tex. Crim. App. 2001) (to be effective, limiting instruction should be given at time evidence is admitted).

Although appellant does not address these four factors in either his original or reply briefs, it can be inferred from his arguments that his Rule 403 challenge is based on the fourth factor, the State's need for the evidence. Appellant urges that the probative value of the extraneous offense testimony was low because (1) intent was only a material element of the burglary to commit sexual assault count and (2) the State had direct evidence of appellant's intent to commit sexual assault based on appellant's act of masturbation and Brown's testimony. He urges that, because the State had little need for this testimony, its prejudicial effect outweighed any probative value and, therefore, it should have been excluded pursuant to *DeLeon v. State*, 77 S.W.3d 300 (Tex. App.—Austin 2001, pet. ref'd) and *Curtis v. State*, 89 S.W.3d 163 (Tex. App.—Fort Worth 2002, pet. ref'd).

In *DeLeon*, this Court stated that the "State may not introduce extraneous offenses as circumstantial evidence of an element in its case-in-chief if that element can readily be inferred from other uncontested evidence," and reasoned that it was improper to admit extraneous sexual offense testimony because appellant's intent could be inferred from the complainant's testimony that,

15

on three separate occasions, appellant touched her breast, pulled down her bathing suit, and watched her in the shower. 77 S.W.3d at 307, 312. The *Curtis* court similarly held extraneous offense evidence inadmissible because appellant's intent to sexually assault his victim could be inferred from the existence of his sperm in her vagina. 89 S.W.3d at 175.

Both *DeLeon* and *Curtis* are distinguishable from the instant case because, in those cases, the evidence from which intent could be inferred was uncontested. *Curtis*, 89 S.W.3d at 175; *DeLeon*, 77 S.W.3d at 312. Here, although appellant did not dispute that he was the source of the semen stains found on Brown's sweatshirt, he did challenge whether those deposits were made intentionally, rather than by mistake, accident, or consensual activity.[5] Not only did appellant urge that the DNA expert could not testify to appellant's mental state at the time the semen stains were made, he also asserted at multiple points during the trial that Brown opened her door to appellant after having drunk some wine. As in *Rickerson v. State* and *Brown v. State*, because appellant suggested that the sexual activity was consensual, such intent cannot be inferred from the occurrence of the act itself. 138 S.W.3d at 531; 96 S.W.3d at 512. Additionally, appellant attempted to impeach Brown's testimony about his act of masturbation by challenging whether she could actually see or hear what appellant was doing because she was turned to her side, the lights were dim, she was

---

[5] Although not relevant to the issue of whether appellant opened the 404(b) door, the argument presented in his closing statement is instructive to the theory he pursed throughout the trial. He stated that Brown's testimony "begs the question of how does the biological evidence get there? . . . . We don't know if it is an accident, we don't know if it is a mistake, consent, we just don't know. . . . No one questions . . . the deposit of the biological material. What the question is is under what circumstances." Appellant reiterated this theory several times, tying in the points he made earlier in the trial regarding Brown drinking wine, "opening" the door to appellant, "giving" him the credit card and car keys, the lack of resistance, and the DNA expert's inability to testify to the circumstances surrounding the deposit.

praying, and she did not discuss the sounds she heard during her videotaped statement. As in *Jones v. State*, the State's need for the evidence was apparent after appellant challenged Brown's credibility on cross-examination. 119 S.W.3d 412, 423 (Tex. App.—Fort Worth 2003, no pet.); *see also Corley*, 987 S.W.2d at 619 (court should consider whether State has alternative sources of proof available to prove element of intent).

The evidence from which appellant's intent could have been inferred—his act of masturbation and Brown's testimony—was contested, and the State did not have any other direct evidence of appellant's intent. That appellant conceded to being the source of the semen stains only established his identity, not his intent. Given this, and because intent was a material element of the offense on which the State carried the burden of proof, the probative value of L.S.'s testimony was high and was not overcome by the danger of unfair prejudice. Any prejudicial effect of this evidence was lessened by the limiting instructions, which were given to the jury immediately preceding L.S.'s testimony and as part of the charge. *See Lane*, 933 S.W.2d at 520.

The trial court did not abuse its discretion by admitting L.S.'s testimony about the 1992 offense for the purpose of proving appellant's intent to sexually assault Brown because it was relevant—based on the fact that appellant's intent was at issue and the similarities between the extraneous and charged offenses—and it was not unduly prejudicial. Appellant's second issue is overruled.

**Suggestive Photographic Array**

After Brown made an in-court identification of appellant and testified to the facts of the offense, the State called Corey Webb as a witness. Webb had been found in possession of the

17

vehicle stolen from Brown and he identified appellant in court as the man who "rented" him the car. Appellant did not object to Webb's in-court identification. On cross-examination, however, appellant attempted to impeach Webb's identification by questioning him about the accuracy of the description Webb had given to the police.[6] Appellant also attempted to impeach Webb's credibility by asking him about the immunity agreement under which Webb was testifying. In an attempt to rehabilitate the credibility of Webb's in-court identification, the State questioned him on redirect about the pretrial identification he made of appellant from a photographic array. At that point, appellant approached the bench and moved to suppress the photographic lineup.

Appellant's objection to the array was based on perceived differences in the photographic quality of appellant's picture as compared to the other five shown. Appellant urged that his photo was very bright and clear, whereas the others appeared blurry or printed from a low-resolution digital camera. A hearing was held outside the jury's presence in which Webb testified that the detective who showed Webb the array allowed him to look at it as "[l]ong as I wanted." Although Webb agreed that appellant's picture had a "clarity different than everyone else's," he denied that any difference in quality led him to select appellant from the array. Rather, he testified that he selected appellant's photo "because I got a good look at him when I was in the room, in the motel room, . . . that is how I knew he had spiky hair. I told Officer Mills when I saw that, he has spiky hair." Detective Farbo also testified at the hearing, stating that she prepared the array "in an

---

[6] Appellant asked Webb if he had first described the man as being "six two or three and about 220 pounds" and "when you came in here today, you know Mr. Fields is the fellow we are talking about . . . [b]ut at the time you talked to Detective Miller, you described a different Caucasian gentleman as six three, 220, right?," to which Webb responded "yes."

18

effort to create a fair photo lineup" and "would consider them all looking somewhat similar to Mr. Fields," although she did acknowledge that, in terms of clarity, appellant's picture "is probably the best photograph."

The trial court denied appellant's motion to suppress the photographic array because he "failed to prove by clear and convincing evidence that the identification procedure was faulty or that it created a substantial likelihood of irreparable harm." Webb then testified in front of the jury that he selected appellant from the photographic array, stating that the detective made no suggestion as to which photo he should select, and the court admitted the array as an exhibit. The detective also testified that Webb selected appellant's photo without hesitation and that no suggestion was made to him regarding his selection.

The State next called Ariel Gillo, who had been found in possession of the credit card stolen from Brown. She first identified appellant in court as the man from whom she had obtained the card and for whom she had arranged the car "rental" with Webb. Appellant did not object to this identification. Gillo then testified that she selected appellant's picture from a photographic array, which was comprised of the same photos as had been shown to Webb, and that no suggestion had been made to her regarding the selection. Gillo testified that she had spent three days with appellant. The officer who showed Gillo the photographic array also testified that Gillo identified appellant's picture "[i]mmediately without hesitation." The photographic array from which Gillo selected appellant's picture was admitted into evidence.

Appellant urges that the trial court reversibly erred by admitting these two photographic lineups because they were impermissibly suggestive, created substantial likelihoods

19

of misidentifications, and violated his due process rights under the Fifth and Fourteenth Amendments. *See* U.S. Const. amends. X, XIV.

The question of whether a pretrial identification procedure was so impermissibly suggestive as to give rise to a substantial likelihood of misidentification is a mixed question of law and fact that does not turn on the trial court's evaluation of credibility and demeanor. *Page v. State*, 125 S.W.3d 640, 646 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). Accordingly, we apply a *de novo* standard of review. *Id*. A pretrial identification procedure may be so suggestive and conducive to mistaken identification that its subsequent use at trial will deny the appellant his right to constitutional due process. *Barley v. State*, 905 S.W.2d 27, 32-33 (Tex. Crim. App. 1995). The Supreme Court has formulated the following two-part inquiry: considering the totality of the circumstances, (1) did the accused establish by clear and convincing evidence that the pretrial identification procedure was impermissibly suggestive and, if so, (2) did the procedure create a very substantial likelihood of irreparable misidentification? *Simmons v. United States*, 390 U.S. 377, 384 (1968); *see also Neil v. Biggers*, 409 U.S. 188, 199-200 (1972) (setting forth five factors to consider in answering second part of inquiry).

Suggestiveness may be demonstrated either by the manner in which the pretrial identification was conducted or by the content of the photographic array itself. *Ibarra v. State*, 11 S.W.3d 189, 196 (Tex. Crim. App. 1999). Here, appellant challenges only the content of the array, not the procedure used. The content of "a photographic array is not impermissibly suggestive merely because each photograph can be distinguished in some manner from the photograph of the accused. Slight differences in color and background are insignificant." *Page*, 125 S.W.3d at 647.

Several cases have considered whether a photographic array was impermissibly suggestive based on its content. In *Page v. State*, the court determined that a photographic array was not impermissibly suggestive where (1) the accused's Texas driver's license photograph was used in the array and none of the other five pictures were of that type and (2) the background and texture of the accused's photograph was distinct from the other five. *Id.* The court placed more importance on the fact that all six pictures displayed men with similar physical characteristics than on the variances in photographic quality between the pictures. *Id.*

In *Barley v. State*, the court held that it was not impermissibly suggestive for the accused's photo to be the only one "taken outside in a yard" with "a small degree of greenery showing" and "a very definitive sunlight reflection off of the individual's face giving the picture a more pinkish tint than the others," whereas two of the other photographs were "older and faded." 906 S.W.2d at 33. The court stated that, "[w]hile we do not encourage the utilization of photographs that are so different in lighting and background," it was permissible because the circumstances of the case made it necessary to take a new photo of the accused, and the witnesses testified that no suggestion was made about which photo to select and that any differences in photographic quality between the pictures did not influence their selections. *Id.*

In *United States v. Merkt*, the photographic array contained seven color photographs of Hispanic women and one black-and-white photograph of a Caucasian woman, the accused. 794 F.2d 950, 958 (5th Cir. 1999). Although the court found the content of this array to be impermissibly suggestive, it was nevertheless admissible because the accused failed to prove that the array's suggestiveness created a substantial likelihood of an irreparable misidentification, given that the

witnesses had a good opportunity to view the accused during the relevant events and were certain in their selections, among other circumstances. *Id*. at 958-59.

In the photographic arrays shown to Webb and Gillo, all six photos are the same size, in color, and depict Caucasian males with short brown hair who are looking forward with similar expressions on their faces and who appear to be about the same age. While the photographic quality of appellant's picture is slightly clearer, the variance is not so noticeable as to be distracting; even when questioned specifically about this point, Webb testified that his selection of appellant's picture was in no way influenced by a difference in photographic quality. And, the record demonstrates that both Webb and Gillo selected appellant's picture without hesitation and that no suggestion was made to either of them about which photo to select. Webb testified that the basis behind his selection was the "good look" he got of appellant at the motel and his remembrance of appellant's "spiky hair." Gillo testified that she had spent three days with appellant, from which we infer that she had ample opportunity to look at appellant and remember his appearance.

As in *Page* and *Barley*, given the totality of the circumstances, appellant failed to establish by clear and convincing evidence that the photographic arrays shown to Webb and Gillo were impermissibly suggestive. *See Page*, 125 S.W.3d at 647 (differences in color and background of photos were insignificant where all six photos depicted men with similar physical characteristics); *Barley*, 906 S.W.2d at 33 (variance in photographic style was immaterial where it did not influence selections and no other suggestions were made); *see also Merkt*, 794 F.2d at 958 (even where array was impermissibly suggestive, it was still admissible because witnesses' identifications were reliable). Appellant's third issue is overruled.

## CONCLUSION

Because the record demonstrates that the letter and poem were sufficiently authenticated by their distinctive characteristics, that the extraneous offense testimony was relevant and not unfairly prejudicial, and that the photographic array was not impermissibly suggestive, no reversible error occurred by the admission of this evidence.  We overrule appellant's issues and affirm the judgment.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed:   July 14, 2005

Do Not Publish

23