**Opinion issued December 11, 2025**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-23-00949-CR**

———————————

**CADWALLADER COLES, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 351st District Court**
**Harris County, Texas**
**Trial Court Case No. 1727629**

---

**MEMORANDUM OPINION**

Appellant Cadwallader Coles worked as a technician at a hospital. A jury found appellant guilty of committing a sexual assault on a patient after rejecting his defense that he was framed by the complainant and his wife for financial gain. The trial court sentenced him to six years in prison. Appellant appeals, arguing there was

insufficient evidence to convict him and that the trial court improperly admitted evidence of extraneous offenses. We affirm.

## Background

In February 2021, the complainant, "Jeff,"[1] felt pain in his back that he attributed to kidney stones. Jeff's wife, "Marie," drove him to the emergency room at Townsen Memorial Hospital. Upon arrival, Jeff urinated and vomited on himself. He was seen by nurses and given morphine for his pain, which he rated at "10/10."[2] After he took the morphine, Jeff went to the restroom, where he passed a stone.

A doctor ordered a CT scan. Appellant was on call that evening as the hospital's radiology technologist, and hospital staff called him to come to the hospital to perform Jeff's CT scan.

### A. Jeff's testimony about the events in the CT scan room

At trial, there was conflicting testimony about the events surrounding Jeff's scan. According to Jeff, appellant came to the room where he was waiting and led him to the CT scan room. Marie waited in the waiting area. Once inside the scan room, Jeff laid on the gurney, and appellant performed the scan.

---

[1] We use fictitious names to refer to the complainant and his wife to protect their privacy. *See* TEX. CONST. art. 1, § 30(a)(1).

[2] English is not Jeff's native language, so some of his interactions with the nurses and other members of the hospital staff were translated by Marie.

Jeff testified that, when the scan was complete, appellant locked the door, approached him on the gurney, and began touching his legs. Jeff had his eyes closed, and when he opened them, appellant was pulling down his pants. Jeff closed his eyes again, and his penis began to feel hot. Opening his eyes, Jeff saw that appellant had placed his mouth on Jeff's penis. Jeff "got scared," immediately got up from the gurney, and tried to make his way to the door, which was locked. As he did so, appellant moved between Jeff and door, blocking the exit. According to Jeff, appellant "didn't want me to leave at any time."

Over objection from appellant's counsel, Jeff testified that appellant next took out a cigarette lighter, a glass object that appeared to have been burned, and a "white rock." He held those items up to Jeff's face, making "gestures" near Jeff's mouth. Jeff understood them to be "drugs." At the same time, Jeff testified that appellant was pushing him backwards towards the control room, which is a separate room within the CT scan room from which the technician operates the CT scanner. Jeff put his hands up to defend himself, and he saw appellant place the white rock and other items on a computer keyboard inside the control room. Ultimately, Jeff was able to move past appellant, after which he "got out the door and continued down the hallway not running but walking fast."

**B.** **Appellant's testimony about the events in the CT scan room**

Appellant gave a different version of events inside the scan room. According to appellant, after arriving at the hospital, he went to "warm up" the CT scanner and then walked to the waiting area to retrieve Jeff. Jeff asked whether his wife Marie could accompany them, and appellant said she could but would need to step out before the scan began. As appellant, Jeff, and Marie were making their way towards the scan room, Marie began insisting that because Jeff had passed the stone, appellant should speak with the doctor to confirm the scan would still be necessary. Accordingly, appellant let Jeff and Marie into the scan room and then went to find the doctor. After confirming with the doctor that he should go forward with the scan, appellant returned to the scan room where he found Marie "walking backwards" out of the control room. Appellant asked if he could help, to which Marie responded that she was looking for a restroom. Appellant told Marie she would need to use the restroom near the emergency department, and Marie left the scan room.

Appellant testified that Jeff was already wearing a t-shirt and boxer shorts, so he had Jeff lay on the CT scan table and then went into the control room. When appellant looked through the control room's window, he saw Jeff with both hands inside his shorts and "there's movement." Using the microphone inside the control room, appellant told Jeff to take his hands out of his shorts and place them at his side. Jeff failed to do so, so appellant repeated the instruction. When Jeff again

4

failed to comply, appellant exited the control room, grabbed Jeff's arms, and placed them by his side, telling him not to move. As he did so, Jeff grabbed appellant's wrist. According to appellant, Jeff's hand was wet and "smelled really bad."

Appellant went to a sink to wash his arm, and when he returned, he saw that Jeff had his hands in his shorts again. Appellant told Jeff he was going to cancel the scan and report to the doctor that Jeff had been masturbating while lying on the gurney. Jeff asked appellant not to do that; he then lay still on the gurney, and appellant went into the control room and completed the scan. According to appellant, when the scan was done, he lowered the gurney and Jeff, still in his boxers, ran out of the room.

The scan showed Jeff did not have a kidney stone.

## C.     Jeff reports the events in the CT scan room

Jeff left the CT scan room and returned to the waiting area for the emergency room, where he found Marie. He reported to her what had happened. Marie told the nurse, who called the police. The nurse described Jeff's demeanor as "very scared," "talking very fast," "upset," and "very hyped up because of what he was saying happened to him." The nurse asked appellant if he understood what Jeff and Marie were saying he had done, to which appellant responded, "I did nothing." The nurse told appellant to return to the scan room and wait there until the police arrived, which he did.

At some point after he reported the incident to Marie, Jeff and Marie discussed bringing a civil suit against the hospital. They later sued the hospital for two million dollars and settled for sixty thousand dollars.

When the police arrived, they interviewed both Jeff (through Marie) and appellant. Each of them gave their respective version of the events that had occurred in the CT scan room, with appellant continuing to deny he had engaged in any sexual contact with Jeff. Appellant called Jeff's allegations "crazy."

Appellant initially testified during his direct-examination as follows regarding his claim that Jeff had been masturbating:

Q. When the police were interviewing you, how come you didn't tell them about the fact that [Jeff] was masturbating or touching himself?

A. Because this was after when I came out of the room, he made these claims against me. When they asked me happened, I just said that he was touching himself. But, no—I didn't want to sound like I was tit for tat. You know, that time he said I did this, so I said he did that. I thought it would come out and eventually when they did the testing, they would come out.

But on cross-examination, appellant testified as follows:

Q. . . . This claim that you have about at the complainant masturbating in the CT scan room, you never mentioned it to the police, correct?

A. Right.

Q. You never mentioned it to Officer Hoang?

A. I didn't mention it to anybody.

Q. You never mentioned it to Detective Kimberlin?

A. No, sir.

6

Q. You didn't also mention it to your colleague, Ms. Medina, the nurse in charge that night, right?

A. No, I didn't. I, um—I can't talk.

Video from the bodycam worn by the detective who interviewed appellant, which was introduced into evidence without objection, shows the detective telling appellant she "wants to get his side of the story," asking him "what happened here," and telling appellant the interview was his "opportunity to let us know the truth."[3] Appellant stated that he brought Jeff into the CT scan room, performed the scan, and brought Jeff out of the scan room, and then Jeff ran out. Appellant did not say Jeff masturbated or had touched his genitals in response to any of these questions but said Jeff is "crazy" for saying appellant put his mouth on Jeff's penis. Appellant also did not tell police that Marie came into the CT scan room.

Over objection by appellant's counsel, the detective on scene testified that when she looked in the control room area of the CT scan room, she found "white powder residue" on the desk and on the inside of a binder sitting on the desk, what appeared to be a crack rock, a toothpick container with a "white powdery residue" inside, a cigarette lighter, and drug paraphernalia inside an Altoid container. The jury was shown the video from the detective's bodycam as she looked through the control room, as well as still photographs of the scene. Photographs of the control

---

[3]     The recording is over one hour long, but only certain parts of the audio of the recording can be heard on the exhibit; the remaining audio was redacted.

room and of the drugs and drug paraphernalia found within it were admitted into evidence without objection. The police performed a field test on the substances found in the control room, which indicated they were cocaine. The detective asked appellant who had access to the control room, and appellant responded that he was the only person conducting scans there that evening.

During his trial testimony, appellant denied the drugs and drug paraphernalia found in the control room were his. Appellant admitted to ownership of the Altoid container in which drug paraphernalia was found, but he testified he had Altoids in the container, and that the drug paraphernalia inside the container was not his. According to appellant, Marie planted the drugs and drug paraphernalia in the control room when, at her insistence, he went to find the doctor to confirm the scan would still be necessary after Jeff passed the stone. Appellant testified that he believed Marie "pick[]ed that Altoid can up and put the Altoids in her purse and emptied it and put that stuff in there." Appellant also testified that another technologist working at the hospital would have access to the control room from 7:00 a.m. to 3:00 p.m., "but not ever at night."

The police swabbed Jeff's penis for DNA and took a buccal swab from both appellant and Jeff. The DNA analyst who analyzed the samples testified that DNA testing showed "very strong support" that appellant's DNA was in the swab taken from Jeff's penis, with the phrase "very strong support" being "the strongest level

8

of support we can assign to a sample." The analyst explained that the test showed it was 36 quadrillion times more likely that the DNA taken from Jeff's penis came from appellant than from another, unknown individual. Appellant explained the presence of his DNA in the swab from Jeff's penis by testifying that when Jeff grabbed his wrist while lying on the gurney, Jeff's hand had "slobber or whatever" on it, after which Jeff masturbated again, thereby transferring appellant's DNA to Jeff's penis. According to appellant, "it was done on purpose."

**D.     The search of appellant at the Harris County jail**

Appellant was arrested that night and taken to the local jail. The following morning, an officer transported him to the Harris County jail. When he arrived at the Harris County jail, the detention officers there performed a strip search and body cavity search. Over objection by appellant's counsel, the officer who had transported appellant from the local jail to the Harris County jail, who did not perform the search but was present for it, testified that a crack pipe was found in appellant's anal cavity. During cross-examination, appellant denied he was strip searched, denied that a crack pipe was found in his rectum, and denied recognizing the crack pipe that was introduced as evidence at trial.

The jury found appellant guilty of sexual assault, and the trial court sentenced him to six years in prison.

## Analysis

Appellant raises three issues on appeal. First, he contends the trial court erred by admitting evidence of "possessing and using drugs." Second, appellant contends the trial court erred by allowing the State to reopen its case and introduce testimony about the crack pipe found during his strip search at the Harris County jail. And third, appellant argues there was legally insufficient evidence for the jury to convict him of sexual assault.

### A.    Sufficiency of the evidence

We begin with appellant's third issue. "We address the legal-sufficiency issue first because, in the event it is meritorious, we would render a judgment of acquittal rather than reverse and remand." *Rodriguez v. State*, No. 01-18-00708-CR, 2019 WL 5699737, at *2 n.2 (Tex. App.—Houston [1st Dist.] Nov. 5, 2019, no pet.) (mem. op.; not designated for publication) (citing *Benavidez v. State*, 323 S.W.3d 179, 181 (Tex. Crim. App. 2010)).

#### 1.    Standard of review

When reviewing a jury's verdict for evidentiary sufficiency, we must uphold the verdict if any rational trier of fact could have found all the essential elements of the offense proven beyond a reasonable doubt. *Edward v. State*, 635 S.W.3d 649, 655 (Tex. Crim. App. 2021). The jury's verdict is irrational under this standard only if it is based on evidence that is not legally sufficient to support a conviction. *Id.* at

10

655–56; *see Cary v. State*, 507 S.W.3d 761, 766 (Tex. Crim. App. 2016) (appellate court's role is not to act as thirteenth juror but to ensure jury's verdict is rational one "based on more than a mere modicum of evidence" (quotation marks omitted)).

In a legal-sufficiency review, we consider all the admitted evidence, whether properly or improperly admitted, and view it in the light most favorable to the verdict. *Harrell v. State*, 620 S.W.3d 910, 913–14 (Tex. Crim. App. 2021); *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013).

This standard recognizes it is the jury's prerogative to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Harrell*, 620 S.W.3d at 914. "The jury is the sole judge of the credibility and weight to be attached to the testimony of witnesses." *Merritt v. State*, 368 S.W.3d 516, 525 (Tex. Crim. App. 2012). As the sole factfinder, the jury may reasonably infer facts from the evidence presented, credit the witnesses it chooses, disbelieve any or all of the evidence or testimony proffered, and weigh the evidence as it sees fit. *See Canfield v. State*, 429 S.W.3d 54, 65 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). We afford almost complete deference to the jury's determinations of credibility. *See id.* (citing *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008)).

In the event of conflicting evidence, we presume the jury resolved conflicts in favor of the verdict and defer to that determination. *Isassi v. State*, 330 S.W.3d 633,

11

638 (Tex. Crim. App. 2010); *Canfield*, 429 S.W.3d at 65. "Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient." *See Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). And a conviction for sexual assault "is supportable on the uncorroborated testimony of the victim . . . if the victim informed any person, other than the defendant, of the alleged offense within one year after the date on which the offense is alleged to have occurred." TEX. CODE CRIM. PROC. art. 38.07(a).

2. **The jury's verdict is supported by sufficient evidence**

Appellant argues there was insufficient evidence to support his conviction for sexual assault. In relevant part, a person commits sexual assault if "the person intentionally or knowingly . . . causes the sexual organ of another person, without that person's consent, to contact or penetrate the mouth . . . of another person, including the actor." TEX. PENAL CODE § 22.011(a)(1)(C). The offense of sexual assault thus has four elements: intent or knowledge, causation, contact, and consent. *Id*. In his reply brief, appellant confirms he is challenging the sufficiency of the evidence to support the contact element.

We conclude there was sufficient evidence for a rational jury to find that the State proved the contact element beyond a reasonable doubt. Jeff testified that as he lay with his eyes closed in the CT scan room, he felt his penis get hot. When Jeff opened his eyes, he saw appellant's mouth on his penis. Because Jeff told Marie

12

about this incident immediately after leaving the scan room, his testimony alone is sufficient for a rational jury to find the contact element satisfied. *See* TEX. CODE CRIM. PROC. art. 38.07(a); *Bond v. State*, No. 01-18-00741-CR, 2020 WL 4006446, at *6 (Tex. App.—Houston [1st Dist. July 16, 2020, no pet.) (mem. op.; not designated for publication) ("The complainant's testimony, standing alone, is sufficient to support a conviction for sexual assault."). And, although appellant testified to a different version of events in which there was no contact between his mouth and Jeff's penis, the jury was the sole judge of the witnesses' credibility, and it was within the jury's province to resolve conflicts in the testimony. *See Merritt*, 368 S.W.3d at 525; *Harrell*, 620 S.W.3d at 914.

Further, Jeff's testimony was not the only evidence on which a rational jury could have found contact. The State's DNA analyst testified that testing showed "very strong support" for the proposition that appellant was the source of the DNA found on Jeff's penis, and more specifically that it was 36 quadrillion times more likely that the DNA found on Jeff's penis came from appellant than some other, unknown individual. Based on this testimony, a rational jury could find the State proved the contact element of sexual assault beyond a reasonable doubt. *See Green v. State*, 607 S.W.3d 147, 154 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (evidence was legally sufficient to support conviction for aggravated sexual assault where DNA analyst testified that when DNA swab collected from complainant

13

contained DNA from three individuals, it "yielded a DNA profile 1.25 octillion times more likely if the DNA came from Complainant, Appellant, and an unknown person than if it came from Complainant and two unknown persons").

Appellant concedes the DNA evidence "confirmed contact" between him and Jeff but nonetheless contends the evidence was legally insufficient to support his conviction because the DNA evidence "could support both parties' versions of events." According to appellant, the DNA evidence introduced at trial "aligns perfectly" with his testimony that he made "defensive contact" while stopping Jeff's "inappropriate behavior."[4]

Appellant's "defensive contact" argument apparently is based on the theory that his DNA was found on Jeff's penis because Jeff grabbed appellant's wrist while he was instructing Jeff to keep his arms at his sides for the CT scan, after which Jeff again put his hands inside his pants and masturbated. In support of this argument,

---

[4]     Appellant argues that "physical evidence compatible with multiple explanations cannot alone establish guilt." To support this contention, he cites our decision in *Wilson v. State*, 473 S.W.3d 889 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd). Appellant's reliance on *Wilson* is misplaced. *Wilson* was an appeal of a sexual-assault conviction based on the defendant's actions while the complainant was too intoxicated to recall the assault. *Id.* at 898. The defendant claimed that, because he had testified the sexual contact was consensual, and the complainant was unable to remember what happened, the State could not prove a lack of consent. *Id.* We held that "the fact that the complainant did not remember the sexual assault is not dispositive of the issue of consent." *Id.* We did not suggest that "physical evidence compatible with multiple explanations cannot alone establish guilt." And, in any event, it was not "physical evidence" alone that supported the jury's verdict. Jeff's testimony also provided sufficient evidence upon which a rational jury could have found the contact element was satisfied. *See* TEX. CODE CRIM. PROC. art. 38.07(a).

14

appellant relies on testimony by the State's DNA analyst that it is possible for DNA to be transferred by this "touch" method, such that while appellant's DNA was found on Jeff's penis, "[w]e don't know how the DNA got there," or whether it came from saliva or touch.

A rational jury nevertheless could reject this theory. First, on the night of the assault, appellant did not mention to anyone that Jeff had masturbated or touched his genitals after grabbing appellant's wrist, neither to the nurses on duty nor to the police officers interviewing him, despite expressly being asked by the detective to "tell us what happened," give us "your side of the story," and "let us know the truth." Appellant did not mention his defensive contact theory until he was testifying at trial.

Second, a rational jury could discredit appellant's testimony that Jeff masturbated prior to his CT scan, particularly in light of Jeff's contrary testimony and his testimony that he came to the hospital complaining of a kidney stone, that he was experiencing pain at a level of "10/10," that he had passed a kidney stone immediately prior to going into the scan room, and that he had just urinated and vomited all over himself.

And finally, the jury was free to discredit appellant's testimony and accept that of Jeff and the other witnesses whose testimony corroborated Jeff's version of events. *See Harrell*, 620 S.W.3d at 914.

15

Appellant also contends the evidence was insufficient to support his conviction because the trial court improperly admitted evidence of drugs and drug paraphernalia found in the control room, as well as the crack pipe found during appellant's strip search. According to appellant, this inadmissible evidence "influenced the jury's credibility determinations, making them irrational jurors."

For the reasons explained below, we conclude the trial court acted within its discretion in allowing evidence of the drugs, drug paraphernalia, and crack pipe. But, even if the trial court had erred in admitting this evidence, our conclusion that appellant's conviction is supported by sufficient evidence would not change. In a legal-sufficiency review, we consider *all* the evidence admitted at trial, regardless of whether it was properly or improperly admitted. *Winfrey*, 393 S.W.3d at 767. Moreover, appellant concedes that, even if the challenged evidence is set aside, what remains is a "credibility contest" between his testimony and that of the other witnesses. And, as "the sole judge of the credibility and weight to be attached to the testimony of witnesses," the jury resolves that credibility contest. *Merritt*, 368 S.W.3d at 525.

Finally, appellant contends there was insufficient evidence to support his conviction because Jeff and Marie discussed bringing a civil lawsuit against the

16

hospital immediately after Jeff reported the assault to her,[5] thus suggesting they had a "financial motivation" that "undermines any corroborative value of the prompt report." But even assuming the civil suit suggests a financial incentive, it would go to the question of witness credibility, and again, the jury is the sole judge of witness credibility. *See id.*

We overrule appellant's third issue.

## B. Admission of evidence of drugs and drug paraphernalia

In two issues, appellant challenges the trial court's admission of evidence of drugs and drug paraphernalia. His first issue contends the trial court erred by admitting evidence of his "possession of drugs" and "drug use." His second issue argues the trial court erred by admitting evidence of the crack pipe discovered during his strip search at the Harris County jail.

Appellant does not specify the particular drug-related testimony or exhibits he contends was inadmissible in his first issue. But the trial court allowed the introduction of three categories of drug- and drug-paraphernalia-related evidence at trial: (1) testimony about the white rock, burned glass object, and cigarette lighter that appellant held up to Jeff's face and gestured with immediately after the assault

---

[5] In his briefing, appellant claims Jeff and Marie discussed the possibility of bringing a civil suit "immediately after the alleged assault." And while the record reflects that Jeff and Marie ultimately filed a civil suit, appellant does not cite any portion of the record to suggest they discussed doing so "immediately" after the assault.

17

(collectively, the "Post-Assault Drug Evidence"); (2) the drugs and drug paraphernalia found in the control room (collectively, the "Control Room Drug Evidence"); and (3) the crack pipe discovered during appellant's strip search at the Harris County jail (the "Crack Pipe Evidence"). We understand appellant's first issue to be an attack on admission of the Post-Assault Drug Evidence and Control Room Drug Evidence, and his second issue to be limited to an attack on admission of the Crack Pipe Evidence.

## 1. The Post-Assault Drug Evidence

Appellant contends the trial court erred when it permitted Jeff to testify about the Post-Assault Drug Evidence. According to appellant, this evidence was irrelevant and improper character-propensity evidence of an extraneous offense and thus violated Texas Rules of Evidence 403 and 404(b), respectively. We disagree.

### a. Rule 404(b)

We first consider whether the trial court violated Rule 404(b) when it admitted the Post-Assault Drug Evidence. Under Rule 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformance with the character." TEX. R. EVID. 404(b). Appellant contends this rule barred admission of the Post-Assault Drug Evidence because it was evidence of an extraneous bad act introduced for the purpose of showing his poor character and that he acted in conformity with that

18

character when he committed the assault. The State responds that this evidence was admissible because it was introduced for other, non-character-propensity purposes, including the purpose of establishing an "indivisible criminal transaction."

We review a trial court's ruling on the admission of extraneous offenses for an abuse of discretion. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009). We uphold the trial court's ruling so long as it falls within the "zone of reasonable disagreement." *Id.* In addition, we will uphold the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002).

Under Rule 404(b), evidence of crimes, wrongs, or acts other than the offense charged is not admissible to prove the character of a person in order to show that he acted in conformity with that character. *See* TEX. R. EVID. 404(b)(1). But this rule only excludes evidence offered solely for the purpose of proving bad character and conformity with that character. *De La Paz*, 279 S.W.3d at 343. The same evidence may be admissible for another purpose, such as proving motive or intent. TEX. R. EVID. 404(b)(2); *De La Paz*, 279 S.W.3d at 342–43.

One of the other purposes for which such evidence may be admitted is to show an "indivisible criminal transaction," that is, as "same-transaction contextual evidence." *Inthalangsy v. State*, 634 S.W.3d 749, 756 (Tex. Crim. App. 2021).

19

"Same-transaction contextual evidence 'illuminate[s] the nature of the crime charged.'" *Id.* (alteration in original; quoting *Camacho v. State*, 864 S.W.2d 524, 532 (Tex. Crim. App. 1993)). It may be admissible "where 'several crimes are intermixed, or blended with one another, or connected so that they form an indivisible criminal transaction, and full proof by testimony . . . of any one of them cannot be given without showing the others.'" *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011) (quoting *Wyatt v. State*, 23 S.W.3d 18, 25 (Tex. Crim. App. 2000)). "[S]ame-transaction contextual evidence is admissible only when the [charged] offense would make little or no sense without also bringing in [the same-transaction contextual] evidence." *Id.*

The purpose of admitting same-transaction contextual evidence is to put the charged offense in context. *Camacho*, 864 S.W.2d at 532; *see Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000) ("Such extraneous offenses are admissible [as same-transaction contextual evidence] to show the context in which the criminal act occurred."). "[E]vents do not occur in a vacuum, and the jury has a right to hear what occurred immediately prior to and subsequent to the commission of [the charged offense] so that it may realistically evaluate the evidence." *Wesbrook*, 29 S.W.3d at 115. Same-transaction contextual evidence is thus admissible when several offenses are so interconnected as to form a single, indivisible criminal transaction, such that in describing one it is "impracticable" to

20

avoid describing the other. *McDonald v. State*, 179 S.W.3d 571, 577 (Tex. Crim. App. 2005).

Here, it was within the zone of reasonable disagreement for the trial court to conclude the Post-Assault Drug Evidence was so intertwined with the sexual assault that the jury's understanding of the assault would have been incomplete without it, and that it was not introduced solely to show character conformity. Both events occurred close in time, at the same location, and as a part of a continuous course of events, such that a description of the Post-Assault Drug Evidence was necessary to fully explain the assault and the circumstances surrounding it. Jeff's description of the Post-Assault Drug Evidence makes clear it was appellant's immediate and responsive reaction when Jeff got off the gurney and tried to exit the scan room. It was thus necessary for the jury's understanding of Jeff's response to the assault and appellant's reaction to Jeff's response.

A jury also could reasonably infer appellant was trying to use drugs as a means of "bribing" Jeff not to report the assault or that he was trying to persuade Jeff to intoxicate himself to diminish his credibility should he report the incident. Indeed, although he describes the theory as "specious at best," appellant concedes the Post-Assault Drug Evidence might be viewed as an effort to "bribe [Jeff] to not report [appellant] for a sexual abuse." Therefore, the Post-Assault Drug Evidence formed an "indivisible criminal transaction" with the assault and was properly admitted. *See*

*Inthalangsy*, 634 S.W.35 at 756; *see also Beltran v. State*, 517 S.W.3d 243, 249 (Tex. App.—San Antonio 2017, no pet.) (in defendant's trial for sexual assault of a child, testimony that defendant was a "drug dealer" and sold drugs to mother of complainant was admissible as same transaction contextual evidence because such testimony was "necessary to explain how [the defendant] had access to [the victim]" and explained why complainant was in defendant's house without her mother); *Taylor v. State*, 263 S.W.3d 304, 314 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (evidence that defendant gave sexual assault complainant bag of cocaine immediately after assault admissible as same-transaction contextual evidence), *aff'd*, 268 S.W.3d 561 (Tex. Crim. App. 2008); *Heiman v. State*, 923 S.W.2d 622, 626 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd) (evidence that defendant injected cocaine into himself and complainant at time of offense of indecency with child was admissible as same-transaction contextual evidence).

We conclude the trial court did not abuse its discretion in determining that the Post-Assault Drug Evidence was admissible as same-transaction contextual evidence under Texas Rule of Evidence 404(b).

### b. Rule 403

Appellant also argues that even if the Post-Assault Drug Evidence was admissible under Rule 404(b), it still should have been excluded as unfairly prejudicial under Rule 403. Rule 403 states, "[t]he court may exclude relevant

evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." TEX. R. EVID. 403. Like Rule 404, we review the trial court's evidentiary decisions under Rule 403 for an abuse of discretion, that is, to determine whether they fall within the zone of reasonable disagreement. *See Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018).

In balancing the probative value of evidence against its danger of unfair prejudice for purposes of a Rule 403 analysis, the trial court must consider the following non-exclusive factors:

> (1) how probative the evidence is, (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way; (3) the time the proponent needs to develop the evidence; and (4) the proponent's need for the evidence.

*Colone v. State*, 573 S.W.3d 249, 256 (Tex. Crim. App. 2019). However, these factors "may well blend together in practice." *Gigliobianco v. State*, 210 S.W.3d 637, 642 (Tex. Crim. App. 2006). We conclude the Rule 403 factors support admission of the Post-Assault Drug Evidence.

Under the first factor, "'probative value' refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence," the fourth factor. *Id*. at 641. Appellant and Jeff were the only people in the scan room at the time the assault occurred, and

they gave conflicting versions of events. As we explained above, the Post-Assault Drug Evidence could reasonably be viewed as a bribe or invitation to Jeff to intoxicate himself, either of which would suggest a consciousness of guilt on appellant's part, and "[a] consciousness of guilt is perhaps one of the strongest kinds of evidence of guilt." *Hedrick v. State*, 473 S.W.3d 824, 831 (Tex. App.—Houston [14th Dist.] 2015, no pet.). Therefore, this evidence was significantly probative in resolving the conflict between Jeff's testimony and that of appellant, and the State had a need for it because there were no other witnesses to the assault. The first and fourth factors favor admission.

The same is true of the second factor, which addresses the potential of the extraneous offense evidence to impress the jury in some irrational but indelible way. *Colone*, 573 S.W.3d at 256. The Post-Assault Drug Evidence was not as disturbing as the charged offense, and it was not graphic or gruesome. *De La Paz*, 279 S.W.3d at 343. And considering the need for this evidence to explain the case as a whole, it was not outside the zone of reasonable disagreement for the trial court to conclude the Post-Assault Drug Evidence would not have caused the jury to reach its verdict on an improper basis. *See id*. The second factor weighs in favor of admission.

The third factor considers the amount of time the State needed to develop the evidence. *Colone*, 573 S.W.3d at 256. This factor also supports admission, as Jeff's testimony about the Post-Assault Drug Evidence consumes only four pages of the

24

multi-volume trial transcript. Accordingly, we conclude the probative value of the Post-Assault Drug Evidence was not substantially outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403.

Appellant contends otherwise by arguing "[t]he prejudicial nature of extraneous drug offense evidence in sexual assault cases is well-established" because "[c]ourts have repeatedly found admission of such evidence harmful." But none of the cases appellant cites to support this assertion involved extraneous-drug offenses; in each of them, the extraneous conduct at issue was a sex crime or involved inappropriate sexual contact. *See Bjorgaard v. State*, 220 S.W.3d 555, (Tex. App.—Amarillo 2007, pet. dism'd) ("[T]he disputed evidence consisted of appellant's 1999 conviction for indecency with a child."); *see also Sandoval v. State*, 409 S.W.3d 259, 298 (Tex. App.—Austin 2013, no pet.) (extraneous act was "appellant's touching J.A. on the butt when she was nine or ten years old and pulling her toward him with a creepy smile on his face"); *Curtis v. State*, 89 S.W.3d 163, 169 (Tex. App.—Fort Worth 2002, pet. ref'd) (extraneous offense was appellant's conviction for "sexually assaulting an eighty-two-year-old female . . . eighteen years prior to trial"). As a result, we find the cases on which appellant relies to support his Rule 403 argument unpersuasive in this context.

We conclude the trial court did not abuse its discretion in admitting the Post-Assault Drug Evidence under Rule 403.

25

## 2. The Control Room Drug Evidence

Appellant also challenges the trial court's admission of the Control Room Drug Evidence, arguing that it was both irrelevant and impermissible character-propensity evidence and thus that it violated Rules 403 and 404. *See* TEX. R. EVID. 403, 404(b).

### a. Rule 404

As we noted above, evidence of an extraneous offense or bad act is generally inadmissible to show that on a particular occasion the defendant acted in conformity with that character, but extraneous offense evidence is admissible for other, non-character purposes. *See* TEX. R. EVID. 404(b)(1), (2). The question here, then, is whether the trial court properly admitted the Control Room Drug Evidence for a purpose other than showing character conformity. *See id.*; *De La Paz*, 279 S.W.3d at 342–43. We review this decision for an abuse of discretion, i.e., whether it falls within the zone of reasonable disagreement. *De La Paz*, 279 S.W.3d at 342–43.

We conclude the trial court did not abuse its discretion by admitting the Control Room Drug Evidence under Rule 404(b)(2). One of the non-character purposes for which Rule 404(b)(2) permits the introduction of extraneous-offense evidence is to show a "plan." TEX. R. EVID. 404(b)(2). "When used properly, the 'plan' exception allows admission of evidence to show steps taken by the defendant in preparation for the charged offense." *Daggett v. State*, 187 S.W.3d 444, 451 (Tex.

26

Crim. App. 2005). To fall within the plan exception to the bar on extraneous offense evidence, its proponent must be able to "articulate exactly how an extraneous act tends to prove a step toward an ultimate goal or overarching plan." *Id.* at 452.

The Control Room Drug Evidence was tied to the Post-Assault Drug Evidence, which the State argues showed appellant's plan to "bribe" Jeff with drugs following the assault, or to persuade Jeff to intoxicate himself, either of which was designed to ensure Jeff would be unlikely to report the assault or diminish his credibility if he did. The trial court could have reasonably concluded the Post-Assault Drug Evidence and Control Room Drug Evidence were evidence of appellant's plan to cover up the assault and admit it under the "plan" exception in Rule 404(b)(2). *See* TEX. R. EVID. 404(b)(2); *Daggett*, 187 S.W.3d at 451.

Further, the trial court gave a limiting instruction both during trial and in the jury charge cautioning the jury against improper consideration of the Control Room Drug Evidence. At trial, the judge instructed the jurors they could not consider evidence of other alleged offenses or bad acts for any purpose unless they first found appellant committed the offenses or bad acts, and even then, only for the purpose of determining motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. The trial judge gave the same instruction to the jury in its charge. We presume the jury followed these instructions. *See Bond v. State*, No. 01-18-00741-CR, 2020 WL 4006446, at *10 (Tex. App.—Houston [1st

27

Dist.] July 16, 2020, no pet.) (mem. op.; not designated for publication) ("It is generally presumed that the jury follows the trial court's instructions, and that a limiting instruction cures harm from the erroneous admission of evidence.").

Accordingly, we conclude the trial court did not abuse its discretion in admitting evidence of the Control Room Drug Evidence under Rule 404(b)(2).

### b. Rule 403

Appellant also argues the Control Room Drug Evidence was barred by Rule 403 because its probative value was outweighed by the danger of unfair prejudice. *See* TEX. R. EVID. 403. The same Rule 403 factors we discussed above apply to our consideration of the Control Room Drug Evidence, the admission of which we review for an abuse of discretion. *Colone*, 573 S.W.3d at 256.

The first factor—the probative value of the challenged evidence—weighs in favor of admission because it rebutted appellant's fabrication defense and corroborated Jeff's version of the events inside the control room. *See id.* As such, it had a high probative value for the jury, particularly in light of the conflicting testimony given by Jeff and appellant.

The second Rule 403 factor likewise supports admission because it would not lead the jury to reach its verdict on an improper basis. The Control Room Drug Evidence was neither graphic nor gruesome, and the charged offense of sexual assault was more disturbing by comparison. *See De La Paz*, 279 S.W.3d at 343.

Moreover, the trial court gave a limiting instruction with regards to the Control Room Drug Evidence, which we presume the jury followed. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005).

The third factor is equally supportive of admission of the Control Room Drug Evidence. Discussion of the Control Room Drug Evidence takes up about twenty-five pages of the multi-volume trial transcript, and thus it did not require an inordinate amount of time to develop. *See Colone*, 573 S.W.3d at 256.

And finally, the fourth Rule 403 factor—the State's need for the challenged evidence—also favors admission. Jeff and appellant gave opposing versions of events inside the control room, and as the only people present, they were the only ones who could testify about those events. The State thus had a need for the Control Room Drug Evidence to corroborate Jeff's testimony and rebut appellant's defensive theory of fabrication.

We conclude all of the Rule 403 factors weigh in favor of admission of the Control Room Drug Evidence, and thus that the trial court did not abuse its discretion by allowing it.

We overrule appellant's first issue.

### 3. The Crack Pipe Evidence

In his second issue, appellant contends the trial court erred by allowing the state to reopen its case to present evidence of the crack pipe found during appellant's

strip search at the Harris County jail ("Crack Pipe Evidence"). Appellant argues the Crack Pipe Evidence was inadmissible under Rule 404(b).[6] *See* TEX. R. EVID. 404(b). The State responds that the Crack Pipe Evidence was admissible on multiple grounds, including for purposes of rebutting appellant's fabrication defense. Appellant addresses the other grounds on which the State argues for admission, but his briefing does not discuss the State's fabrication argument.

We agree with the State. Extraneous conduct can be admissible to rebut a defensive fabrication argument. *See Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008). And here, appellant elicited testimony from Jeff and Marie aimed at showing they fabricated the sexual assault for financial gain. In addition, Jeff testified that appellant placed the Post-Assault Drug Evidence on the table inside the control room, whereas appellant later testified it was Marie who put the "drugs and the drug paraphernalia" in the control room and that Marie "lied" when she testified that she did not enter the scan room. Therefore, it was within the zone of reasonable disagreement for the trial court to conclude that the Crack Pipe Evidence was admissible for purposes of rebutting appellant's fabrication defense and corroborating Jeff's testimony. *Garcia Flores v. State*, No. 01-19-00382-CR, 2020

---

[6] We understand appellant's second issue to be a challenge to the trial court's admission of the Crack Pipe Evidence solely under Rule 404(b), and we do not address its admissibility under Rule 403.

WL 3525451, at *3 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd) (mem. op.; not designated for publication).

We overrule appellant's second issue.

## Conclusion

We affirm the judgment of the trial court.

                                        Andrew Johnson
                                        Justice

Panel consists of Justices Guerra, Guiney, and Johnson.

Do not publish. TEX. R. APP. P. 47.2(b).